FLORAL ARTS STUDIO, ET AL. *v.* UNITED STATES (No. 4952) [1]

United States Court of Customs and Patent Appeals, November 5, 1958

*Lawrence & Tuttle* and *Barnes, Richardson & Colburn* (*Frank L. Lawrence* and *Joseph Schwartz* of counsel) for appellants.

*George Cochran Doub,* Assistant Attorney General and *Richard E. FitzGibbon,* Chief, Customs Section for the United States.

Before O'CONNELL, Acting Chief Judge, and WORLEY, RICH, and MARTIN, Associate Judges

MARTIN, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Second Division, C. D. 1943, which overruled the importer's protest and sustained the collector's classification of the imported merchandise as "paper not specially provided for," dutiable at the rate of 30 per centum ad valorem under paragraph 1409 of the Tariff Act of 1930. Appellant contends, here as below that the merchandise, invoiced as "rice paper," is not paper but is dutiable under the provision in paragraph 1558 of the Tariff Act of 1930 as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739, at 10 per centum ad valorem as "articles manufactured, in whole or in part, not specially provided for."

---

[1] C.A.D. 690.

The applicable provisions of the Tariff Act are as follows:

### Tariff Act of 1930.

1409. Jacquard designs on ruled paper, or cut on Jacquard cards, and parts of such designs, 35 per centum ad valorem; hanging paper, not printed, lithographed, dyed, or colored, 10 per centum ad valorem; printed, lithographed, dyed, or colored, 1½ cents per pound and 20 per centum ad valorem; wrapping paper not specially provided for, 30 per centum ad valorem; blotting paper, 30 per centum ad valorem; filtering paper, 5 cents per pound and 15 per centum ad valorem; paper commonly or commercially known as cover paper, plain, uncoated, and undecorated, 30 per centum ad valorem; *paper not specially provided for, 30 per centum ad valorem.* (Emphasis ours.)

1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

### Torquay Protocol to the General Agreement on Tariffs and Trade (T. D. 52739)

| Tariff Act of 1930, paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 1558 | Articles manufactured in whole or in part, not specially provided for. | 10% ad val. |

During the course of the trial below, evidence was adduced to the effect that the imported rice paper was derived from the pith of a plant, the *Aralia papyrifera*, which plant is unrelated to the rice plant, and which pith was found to contain pure cellulose free of lignin and fibrous matter. Testimony was introduced to show that 4 to 6 foot lengths of the *Aralia papyrifera* [2] stalks are cut and the pith or core is separated from the hard surrounding outer shell by being pushed out therefrom. Thereafter, the pith is dried and cut into small cylindrical sections, approximately 1 inch in diameter and 3¼ inches in length from which material the imported merchandise is made. The cylindrical sections are sliced into thin sheets some 2½ to 4 feet long by physically peeling off the skin, as it were, with a sharp knife pressed against the cylindrical surface; thereafter the said sheets are cut into rectangles of 3¼ by 3¾ inch dimensions and piled in bundles for importation. It was further shown below that the imported merchandise is always purchased as "rice paper" and, subsequent to importation, is dyed and cut into various patterns for use in artificial flowers. From the record, this would appear to be the predominant, if not the only, use in the United States of the material in question, although in the Orient it is used as a surface upon which to draw and paint various objects and scenes.

[2] This plant is also known as Fatsia Japonica and is native to the island of Formosa.

The Customs Court found that the merchandise is "paper not specially provided for" within the meaning of paragraph 1409, *supra*, on the ground that the imported merchandise is "paper" within the common meaning of that term; the lower court further predicated its decision upon the assumption that a prior classification of "rice paper" as "paper" in *In re Tuska*, T. D. 11859 (G. A. 850), had been presumptively ratified by Congress in reenacting the tariff acts six times with no substantial change in the provision for "paper, not specially provided for." [3]

Appellant contends that the name "rice paper" is a misnomer and that the imported merchandise is not "paper" since it "does not contain fibrous material nor result from mechanical and chemical processes usual in manufacture of paper." Appellant further contends that the presumption of legislative adoption of the judicial interpretation of the *Tuska* case, *supra*, is inapplicable in view of *In re Lawrence Stationery Co. et al.*, T. D. 12834 (G. A. 1430), since the materials in these cases were not the same as the merchandise at bar, and further, that the pertinent portion of the *Tuska* opinion is dictum.

For the purpose of our decision, it is first necessary to establish the meaning of the word "paper" as used in the Tariff Act of 1930. There are several general principles which are pertinent to this discussion.

Scientific or technical meaning of a tariff term is not considered determinative of the Congressional intent if an inconsistent commercial or common meaning can be ascertained. *Nix* v. *Hedden*, 149 U. S. 304; *American Felsol Co. et al.* v. *United States*, 25 CCPA 367, 371, T. D. 49454; *Nylos Trading Company* v. *United States*, 37 CCPA 71, C. A. D. 422.

Furthermore, it is presumed that a term in the Tariff Act has the same meaning in commerce as that in common use unless otherwise proved. *Hartmann Trunk Co.* v. *United States*, 27 CCPA 254, 257, C. A. D. 95; *C. J. Tower & Sons* v. *United States*, 41 CCPA 195, 199, C. A. D. 550.

We have found nothing that would indicate that the Congress intended the term "paper" as used in the Tariff Act of 1930 or any previous acts, to have a purely technical or scientific meaning. Therefore, we can assume that the Congress attributed the common meaning to the word "paper" when using it in this connection. The question before us is whether the imported merchandise comes within the common meaning of the word "paper" as used in the Tariff Act.

---

[3] Act of 1894, paragraph 310—"all other paper not specially provided for in this Act."
Act of 1897, paragraph 402—"all other paper not specially provided for in this Act."
Act of 1909, paragraph 415—"paper not specially provided for in this section."
Act of 1913, paragraph 332—"all papers * * * not specially provided for in this section."
Act of 1922, paragraph 1309—"paper not specially provided for."

Appellant imports this material as "rice paper." All the invoices list the material as rice paper. In the trial of this case, the commodity was continuously referred to as rice paper by both the appellant and its witnesses, and the appellee and its witness.

Although appellant bought the merchandise as rice paper, it sold the material as wood fiber. In all other instances the merchandise in question was known as rice paper. It is of course true that the use of the name rice paper *per se* does not necessarily define a material within the statutory classification of "paper." Appellant refers us to several cases in which misnomers were not determinative of tariff classification. *Hampton, Jr. & Co.* v. *United States*, 12 Ct. Cust. Appls. 490, T. D. 40695; *Alfred H. Smith Co.* v. *United States*, 11 Treas. Dec. 71, T. D. 27006.

Therefore, to determine whether the merchandise at bar called rice paper is embraced within the common meaning of the statutory term "paper," we shall first have recourse to dictionaries to determine from such authorities whether the substance is embraced by the common meaning of the statutory term. *United States* v. *Tropical Craft Corp., Successors to Tropical Craft Import & Export Corp.*, 42 CCPA 223, 227, C. A. D. 598; *United States* v. *Crosse & Blackwell, Inc.*, 22 CCPA 214, T. D. 47141.

Rice paper is described in the Encyclopedia Britannica, Volume 19 (1957), as follows:

The substance which has received this name in Europe, *through the mistaken notion that it is made from rice*, consists of the pith of a small tree, *Aralia papyrifera*, which grows in the swampy forests of Formosa. The cylindrical core of pith is rolled on a hard flat surface against a knife, by which it is cut into thin sheets of a fine ivory-like texture. Dyed in various colours, rice paper is extensively used for the preparation of artificial flowers, while the white sheets are employed by native artists for water-colour drawings. (Emphasis ours.)

The "Dictionary of Paper" published under the auspices and direction of the American Paper and Pulp Association, New York, 1951, lists "rice paper" as follows:

A paper made from the pith of a small tree (*Aralia papyrifera*) which grows in the swampy forests of Formosa. The cylindrical case (sic) of pith is rolled on a hard flat surface against a knife, by which it is cut into thin sheets of a fine ivory-like texture. Dyed in various colors, rice paper is extensively used for the preparation of artificial flowers; the white sheets are employed by native artists for water-color drawings.

We can conclude from these dictionaries that (1) the definitions of rice paper contained therein describe the merchandise at bar, and (2) the misnomial word in the phrase rice paper is "rice," not "paper," since the source of the substance is not the *oryza sativa*, the rice plant.

The cases cited by appellant regarding misnomers are clearly distinguishable from the case at bar. For example, in the case of

*Hampton, Jr. & Co.* v. *United States, supra,* which involved merchandise known as asbestos shingles, the collector classified the importation as "manufactures in chief value of asbestos." The importers claimed the goods to be free of duty within the classification of "shingles" or by some other classification. The court said:

\* \* \* To hold that Congress intended to admit free of duty any article which could be used for a roof covering, and which might be called by the manufacturer a "shingle," would be to hold that Congress intended to admit free of duty manufacturers of copper, zinc, metal, slate, stone, terra cotta, asbestos, asphaltum, rubberoid, or any other material of any kind which might be used for a similar purpose as wooden shingles and which might arbitrarily be called a certain kind of shingle.

In *Alfred H. Smith Co.* v. *United States, supra,* which involved rubber sponges, the court, in overruling the importer's protest, held that the merchandise was not dutiable within the category of "sponges" and stated, at page 72:

\* \* \* The dictionary definition of the word "sponge" is not so comprehensive as to include a manufacture of india-rubber in resemblance of a natural sponge, even though such manufacture is confessedly useful and convenient in bathing. If the article were a natural growth or existence and came within the proper definition of a sponge, undoubtedly a different conclusion would be warranted. Matheson v. United States (90 Fed. Rep., 276). But I think it may fairly be assumed that Congress, in establishing the rate of duty upon sponges, had in mind the sponge fiber and its complicated framework, an aqueous product, and not the arbitrary designation afterward given to the manufacture in question.

These cases are distinguishable in that the misnomers therein consist in the use of the statutory word to describe a substance which was not included within the common meaning of that statutory term. However, in the case at bar, the misnomial word is "rice" which is used merely as an adjective to modify the noun "paper," whereas the aforesaid noun "paper" is used to name the substance and has the same connotation as the statutory term.

Appellant cites four dictionary definitions listing this substance as "rice paper," which are as follows:

*Standard Dictionary 1895:*

Rice-paper, n. 1. Paper made from rice-straw. 2. A delicate vegetable paper, made in China, used in drawing richly colored flowers, insects, etc., and in making artificial flowers: made from the pith of *Fatsia (Aralia) papyrifera,* pared into thin rolls and flattened into sheets.

*American College Dictionary:*

Rice paper, 1. a thin paper made from the straw of rice in China, etc. 2. a Chinese paper consisting of the pith of certain plants cut and pressed into thin sheets.

*Century Dictionary:*

1. Paper made from the straw of rice, used in China and Japan and elsewhere. 2. A name commonly but erroneously applied to a delicate white film prepared in China from the pith of a shrub, Fatsia papyrifera \* \* \*

*Webster's Universities Dictionary, Library Guild Inc., N. Y., 1904–1940:*

1. A light paper made of rice straw.
2. A thin white film prepared by the Chinese from the pressed dry pith of Fatsia papyrifera, a shrub * * *

Appellant argues that since the material involved herein is given the second listing in each of these dictionaries, this material is not "paper" within the terms of the statute. We might agree with appellant if the Congress had used the term paper in this Act in its technical and scientific sense. However, since the Congress is presumed to have used it in its common meaning, we believe these dictionary citations most significant in considering this case, from the point of view of demonstrating that this material, as well as the fibrous material derived from rice straw, was known as paper.

A catchall provision for paper was first included in the tariff act of 1816 and has been included in some form by the Congress upon each reenactment. 3 Stat. 311 (1816), as amended, 19 U. S. C. § 1001 (1952 ed.), paragraph 1409. Long before 1816, pith material used for analogous purposes to that herein employed was known as paper.

A New English Dictionary on Historical Principles, Oxford (Clarendon Press), 1909, Vol. 7, page 436, defines paper as follows:

1. A substance composed of fibres interlaced into a compact web, made * * * from various fibrous materials * * * which are macerated into a pulp, dried, and pressed * * *.
b. Also applied to other substances used for writing upon, of similar consistency but differently made, as the *Papyrus* of the ancients; * * *.
1613. Purchase Pilgrimage (1614) 506 of the pith or heart of the tree, is made paper for books.
1615. G. Sandys Trav. 102. The sedgie reeds, * * * called formerly *Papyri*, of which they made paper; and whereof ours made of rags, assumeth that name.

According to definitions in dictionaries, common usage and in commercial circles, the merchandise involved with one cited exception has been known for generations and even centuries as paper of some description; and it is therefore our opinion that it comes within the purview of paragraph 1409, of the Tariff Act of 1930.

Furthermore, the two decisions cited, namely, *In re Tuska, supra,* and *In re Lawrence Stationery Company et al., supra,* have some significance in determining the issues herein insofar as we are concerned with ascertaining whether the merchandise at bar is paper within the common meaning of that term irrespective of any legislative ratification of the said decisions.

In the *Tuska* case, *supra,* the general appraisers held that "100,000 sheets of paper" which came from Yokohama, Japan, was rice paper and was known to the trade generally by this designation. They took cognizance of Webster's definition of rice paper as

a kind of delicate paper brought from China and used for painting upon and for the manufacture of fancy articles. It is said to be made from the pith of a plant, the *Araliapapyrifera.*

Although the opinion of the appraisers in this case is not definite in some respects, certainly, a strong presumption arises that the appraisers were adjudicating the classification of merchandise similar to that involved in the case at bar. The appraisers in stating the issues said:

The merchandise was classified as tissue paper, and assessed with duty at 8 cents per pound and 15 per cent. ad valorem, under paragraph 419, act of October 1, 1890.

The importer claims that the merchandise is not tissue paper, but is a manufacture of paper, or of which paper is the component material of chief value, and dutiable at 25 per cent. ad valorem, under paragraph 425, N. T.

In their conclusion, they stated:

(1) That the paper in question is not the tissue paper provided for in paragraph 419, N. T.

(2) That it is not a manufacture of paper, but is rice paper.

Had the importer claimed that the merchandise was dutiable at 25 per cent. ad valorem as paper not specially provided for, and dutiable under paragraph 422, N. T., we might have so found. He did not so claim, however, but based his contention upon the grounds that the merchandise was a manufacture of paper, under paragraph 425, N. T.

We are forced to overrule his protest. The action of the collector stands.

No one in the case, including the importer, the collector, or the appraisers considered the merchandise anything but paper within the provisions of the tariff act of 1890, even though the proper classification of the paper was in dispute.

In the *Lawrence Stationery Company et al.* case, *supra*, the appraisers found that the merchandise involved was similar to the material in the *Tuska* case, *supra*. In overruling the collector's classification that it was tissue paper, they held, one appraiser dissenting, that:

Based upon the above findings, we hold that the merchandise was erroneously classified as tissue paper and assessed with duty at 8 cents per pound and 15 per cent. ad valorem, under paragraph 419, act October 1, 1890. It is dutiable at 25 per cent. ad valorem, under paragraph 425 of the present act, as claimed by the appellants. The protest is sustained.

Paragraph 425 of the act of 1890 classified the material as a manufacture of paper or of which paper was the component material of chief value and dutiable at 25 per cent ad valorem.

The same General Appraiser wrote the opinions in both the *Tuska* and the *Lawrence* cases, *supra*, in behalf of the Board. Although in the *Tuska* case he found that the merchandise was not dutiable under paragraph 425 N. T. of the act of 1890, and in the *Lawrence* case it was, nevertheless, in both cases he found it was paper. As a matter of fact, the dissenting appraiser in the *Lawrence* case said it was paper but disagreed with his colleagues as to the proper classification of the merchandise. Since the appraisers identified the material in both cases as the pith of a plant, the *Aralia papyrifera*, and the merchandise in the case at bar has been identified as the pith of the same plant,

these cases support the collector's contention that the merchandise falls within the common meaning of "paper" within the purview of paragraph 1409 of the Tariff Act of 1930.

Appellant contends that the merchandise in the *Tuska* and *Lawrence* cases is not the same as that in the case at bar since the merchandise in those two cases was shipped from Yokohama, Japan, whereas the instant merchandise was from Formosa. Appellant itself throws some light on this alleged discrepancy.

Raymond E. Raymont, proprietor of the Floral Arts Studio, the appellant, testified as follows:

RQ. In your cross examination I believe you said, "We have also bought it as rice paper." But if you did say that were you then referring to your purchases in Formosa or to purchases which you made in the United States? A. Both. We have bought from brokers in the United States that have purchased over there.

RQ. And when buying from brokers in this country under what name did you buy it? A. Under "rice paper."

RQ. How often has that occurred? A. In recent years very seldom, but prior to the war a great deal of it was purchased here as it was mostly Japanese brokers that brought it in as Japan had control of the island.

This excerpt from the record indicates that the place of shipment does not necessarily determine the origin of the merchandise.

In view of the above, we must conclude that the merchandise involved is paper within the meaning of the Tariff Act of 1930 as amended, and since appellant has not successfully contested the collector's classification, his protest must fail.

We, therefore, *affirm* the judgment of the lower court.