UNITED STATES *v.* SCHMIDT PRITCHARD & CO., MANGANO CYCLES CO. (No. 4980) [1]

___

[1] C.A.D. 750.

United States Court of Customs and Patent Appeals, July 20, 1960

*George Cochran Doub,* Assistant Attorney General, *Richard E. FitzGibbon,* Chief, Customs Section (*Alan S. Rosenthal* and *William A. Montgomery,* trial attorneys, of counsel) for the United States.

*Lamb & Lerch* (*John G. Lerch,* of counsel), *amicus curiae.*

*Barnes, Richardson & Colburn* (*Norman C. Schwartz* and *J. Bradley Colburn,* of counsel) for appellees.

[Oral argument December 2, 1959, by Mr. Rosenthal, Mr. Montgomery, and Mr. Colburn]

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.[2]

SMITH, Judge, delivered the opinion of the court:

Appellees imported bicycles of wheel diameter over twenty-five inches, weighing less than 36 pounds, and not designed for use with tires having a cross-sectional diameter exceeding one and five-eighths inches, which the Customs Collector classified under paragraph 371 of the Tariff Act of 1930, as modified. Duty was assessed at $11\frac{1}{4}$ per-centum ad valorem according to Presidential Proclamation 3108, 70 Stat. C 4, 90 Treas. Dec. 285, T.D. 53883. Presidential Proclamation 3108 purported to modify Proclamation No. 2761 A, 61 Stat. (Part 2) 1103, 82 Treas. Dec. 305, T.D. 51802, issued pursuant to the General Agreement on Tariffs and Trade, 61 Stat. (Part 5) A 1213, which had

---

[2] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge O'Connell,* pursuant to provisions of Section 294 (d), Title 28, United States Code.

set the rate of duty at $1.25 each, but not less than 7½% nor more than 15% ad valorem.

Based upon the allegation that the modification made by Proclamation 3108 is illegal, the importer, acting under section 514 of the Tariff Act of 1930, protested the rate of duty assessed, contending that the duty should have been assessed according to Proclamation No. 2761 A. The Customs Court sustained the protest, and held that Presidential Proclamation No. 3108 was illegal, C.D. 2029. The Government appeals from that judgment.

Proclamation No. 3108, the legality of which is here in issue, was issued after an "escape-clause" proceeding had been instituted pursuant to section 7 of the Trade Agreements Extension Act of 1951, as amended. In addition to the formal "escape-clause" proceeding under section 7, the President had requested and the Tariff Commission had conducted a supplemental investigation, after which its final recommendations were transmitted to the President and Proclamation No. 3108 was issued.

The record here consists of a stipulation of the parties, a certified statement by the Secretary of the Tariff Commission as to the official records of that Commission pertaining to its Investigation No. 37 with respect to bicycles, and copies of official notices, reports and statements in connection with the Commission's proceedings and Presidential action.

The record establishes the following chronology of events pertinent to the present controversy:

1—On June 14, 1954, an application was filed with the Tariff Commission for an investigation of bicycles under section 7, Trade Agreements Act of 1951, as amended.

2—On June 22, 1954, the Tariff Commission, by Order of Investigation No. 37, instituted an investigation under said section 7, with respect to bicycles. Due notice of such investigation was given.

3—On July 8, 1954, the Tariff Commission ordered a public hearing to be held in said Investigation No. 37 on September 21, 1954. Due notice of such hearing was given.

4—On September 21–24, inclusive, 1954, and September 27, 1954, a public hearing was held by the Commission pursuant to said notice.

5—On March 14, 1955, the Tariff Commission submitted a report to the President on its said Investigation No. 37 on bicycles.

6—On May 11, 1955, the President addressed a letter to the Chairman of the Tariff Commission requesting further information and report back to him no later than July 15, 1955.

7—On May 11, 1955, the President addressed a letter to the Chairman of the Committee on Ways and Means, House of Representatives and Committee on Finance, Senate, advising them he was remanding the case to the Commission for further information.

8—On July 14, 1955, the Tariff Commission submitted a supplemental report to the President on its said Investigation No. 37 with respect to bicycles. No public notice was issued and no public hearing was held in connection with the investigation made to gather the data requested by the President.

9—On August 18, 1955, the President issued Proclamation No. 3108 increasing the rates of duty on bicycles. The increased rates so proclaimed differed in part from the rates found and recommended by the Tariff Commission to the President.

10—On August 18, 1955, coincident with the issuance of said proclamation, the President addressed a letter to the Chairman of the Committee on Finance, United States Senate, and the Chairman of the Committee on Ways and Means, House of Representatives, setting forth reasons for his action in promulgating rates of duty different from those found and recommended by the majority of the Commission.

11—On August 19, 1955, the Tariff Commission issued a statement reporting the action of the President, and the reasons stated by him for his action.

The statutory provisions involved are:

A) Section 7 of the Trade Agreements Extension Act of 1951, 65 Stat. 74 (19 U.S.C.A., § 1364 [T.D. 52772]):

Sec. 7. (a) Upon the request of the President, upon resolution of either House of Congress, upon resolution of either the Committee on Finance of the Senate or the Committee on Ways and Means of the House of Representatives, upon its own motion, or upon application of any interested party, the United States Tariff Commission shall promptly make an investigation and make a report thereon not later than one year after the application is made to determine whether any product upon which a concession has been granted under a trade agreement is, as a result, in whole or in part, of the duty or other customs treatment reflecting such concession, being imported into the United States in such increased quantities, either actual or relative, as to cause or threaten serious injury to the domestic industry producing like or directly competitive products.

In the course of any such investigation, whenever it finds evidence of serious injury or threat of serious injury or whenever so directed by resolution of either the Committee on Finance of the Senate or the Committee on Ways and Means of the House of Representatives, the Tariff Commission shall hold hearings giving reasonable public notice thereof and shall afford reasonable opportunity for interested parties to be present, to produce evidence, and to be heard at such hearings.

Should the Tariff Commission find, as the result of its investigation and hearings, that a product on which a concession has been granted is, as a result, in whole or in part, of the duty or other customs treatment reflecting such concession, being imported in such increased quantities, either actual or relative, as to cause or threaten serious injury to the domestic industry producing like or directly competitive products, it shall recommend to the President the withdrawal or modification of the concession, its suspension in whole or in part, or the establishment of import quotas, to the extent and for the time necessary to prevent or remedy such injury. Within sixty days, or sooner if the President has taken action under subsection (c) of this section, the Tariff Commission shall transmit to the Committee on Finance of the Senate and the Committee on Ways and Means of the House of Representatives an exact copy of its report and recommendations to the President.

(b) In arriving at a determination in the foregoing procedure the Tariff Commission, without excluding other factors, shall take into consideration a downward trend of production, employment, prices, profits, or wages in the domestic industry concerned, or a decline in sales, an increase in imports, either actual or relative to domestic production, a higher or growing inventory, or a decline in the proportion of the domestic market supplied by domestic producers.

(c) Upon receipt of the Tariff Commission's report of its investigation and hearings, the President may make such adjustments in the rates of duty, impose such quotas, or make such other modifications as are found and reported by the Commission to be necessary to prevent or remedy serious injury to the respective domestic industry. If the President does not take such action within sixty days he shall immediately submit a report to the Committee on Ways and Means of the House and to the Committee on Finance of the Senate stating why he has not made such adjustments or modifications, or imposed such quotas.

(d) When in the judgment of the Tariff Commission no sufficient reason exists for a recommendation to the President that a concession should be withdrawn or modified or a quota established, it shall make and publish a report stating its findings and conclusions.

B) The 1953 amendments to Section 7 of the Trade Agreements Extension Act of 1951 (Trade Agreements Extension Act of 1953, 67 Stat. 472 [T.D. 53326], Section 102) :

Sec. 102. Time for Certain Reports by Tariff Commission.

The first paragraph of subsection (a) of section 7 of the Trade Agreements Extension Act of 1951 (19 U.S.C., sec. 1364) is hereby amended by striking out "one year" and inserting in lieu thereof "nine months." In the case of any application made under such first paragraph before the date of the enactment of this Act, the United States Tariff Commission shall make its report not later than whichever of the following is the earlier: (1) one year after the application was made, or (2) nine months after the date of the enactment of this Act.

C) The 1955 amendments to Section 7 of the Trade Agreements Extension Act of 1951 (Trade Agreements Extension Act of 1955, 69 Stat. 166 [T.D. 53833], Sections 5 and 6) :

Sec. 5. The last sentence of subsection (a) of section 7 of the Trade Agreements Extension Act of 1951, as amended (19 U.S.C., sec. 1364(a)), is amended to read as follows:

"The Tariff Commission shall immediately make public its findings and recommendations to the President, including any dissenting or separate findings and recommendations, and shall cause a summary thereof to be published in the Federal Register."

Sec. 6. (a) Subsection (b) of section 7 of the Trade Agreements Extension Act of 1951, as amended (19 U.S.C., sec. 1364(b)), is amended by adding at the end thereof the following:

"Increased imports, either actual or relative, shall be considered as the cause or threat of serious injury to the domestic industry producing like or directly competitive products when the Commission finds that such increased imports have contributed substantially towards causing or threatening serious injury to such industry."

(b) Section 7 of the Trade Agreements Extension Act of 1951, as amended (19 U.S.C., sec. 1364), is amended by adding at the end thereof the following new subsection :

"(e) As used in this Act, the terms 'domestic industry producing like or directly competitive products' and 'domestic industry producing like or directly competitive articles' mean that portion or subdivision of the producing organizations manufacturing, assembling, processing, extracting, growing, or otherwise producing like or directly competitive products or articles in commercial quantities. In applying the preceding sentence, the Commission shall (so far as practicable) distinguish or separate the operations of the producing organizations involving the like or directly competitive products or articles referred to in such sentence from the operations of such organizations involving other products or articles."

The importer contends, and the Customs Court found, that the assessed rate on the imported bicycles was illegal because the rate proclaimed was not recommended by the Tariff Commission.

The importer also contends and the Customs Court found that even if it be found that the rate proclaimed for the imported bicycles is legal the entire proclamation is invalid for the reason that the procedural requirements with respect to the investigation and time limit within which the President must act were violated. The importer based that contention upon the following allegations: First, the investigation by the Tariff Commission was not completed within nine months; second, no public hearings were held in connection with the supplementary investigation; and, finally, the President issued the Proclamation more than sixty days after submission of the findings and recommendations by the Tariff Commission.

It is appellant's position that the Customs Court was in error because the procedural requirements of the statute were met and because the modification of the rate of duty on the imported bicycles was an act within the authority delegated to the President.

The procedural questions turning on the time limits provided in section 7(a), while not free from doubt and ambiguity as regards the request of the President to the Tariff Commission for supplemental information and the subsequent supplemental report of the Tariff Commission, which had the practical effect here of enlarging the times provided in section 7(a), should, we think, be resolved in favor of appellant's contentions. The President's report of May 11, 1955, was submitted within the sixty-day period specified in sections 7(a) and 7(c) to the Chairmen of the specified committees of both the Senate and the House, and the report of the Tariff Commission had been submitted to the President within the nine months time period specified in section 7(a).

Thus, Congress was fully and timely notified as to the steps being taken and could, had it desired so to do, have taken independent action as envisaged at the time of the enactment of section 7 of the Trade Agreements Extension Act of 1951.

As pointed out in appellant's brief:

* * * Congress has kept the administration of the escape-clause procedure of Section 7 of Trade Agreements Act of 1951 under close scrutiny. And the legislative history of each of three extension acts which have been enacted since

1951 evinces not only a careful supervision of the practice of the President and the Tariff Commission under Section 7, but also, and more importantly, a clear congressional approval of the interpretation of the President and the Commission that Section 7 permits supplementary inquiries to be conducted without regard to its procedural requirements.

In considering H.R. 1, the bill which became the Trade Agreements Extension Act of 1955, the 84th Congress was fully apprised of the procedure the President and the Tariff Commission had followed in requesting and conducting supplemental investigations in at least three prior investigations under the "escape-clause" provisions of the existing law. In reporting this bill, the House Committee on Ways and Means noted that:

The committee gave extensive consideration to amendments to the escape-clause provisions of existing law, but decided that it was neither necessary nor desirable to change the law. [H. Rept. No. 50, 84th Cong., 1st Sess., p. 4]

As one result of this extensive consideration and despite "the expressed concern from many quarters over the administration of the escape clause," the Committee indicated its approval of the administrative procedures such as were here adopted to secure supplemental information in a section 7 proceeding, as follows:

The committee believes that the President should give full consideration to the Tariff Commission's findings regarding injury. If he believes that these findings should be further developed, or if new information relevant to such findings are disclosed, in the committee's opinion *he should continue his practice of submitting such data to the Tariff Commission for supplemental investigation and findings where appropriate.* (Emphasis added.)

Similarly, a study of the past operation of section 7, as administered by the President and the Tariff Commission, was made by Congress before enactment of the Trade Agreements Extension Act of 1958, 72 Stat. 673. While section 7 was again amended in several respects, including a shortening of the nine-month time limit to six months, no disapproval of the prior administrative practice was evidenced either in the committee reports, or by changes in the text of the statute itself.

In these circumstances, we think Congress must be deemed to have approved and, in effect, ratified this prior administrative interpretation and application. As this court held in a related context:

* * * Both the House of Representatives and the Senate, after lengthy hearings and full consideration, and with knowledge of the President's interpretation of the Trade Agreements Act, have continued to extend the President's power to enter into trade agreements, and have continued to make appropriations to carry on this function. This action by Congress amounts to legislative approval of the President's action * * *. Therefore it seems plain that Congress intended to authorize the President to do what he has done in the instant case; * * *. [*Greene Cattle Co.* v. *United States,* 36 C.C.P.A. (Customs) 52, 60, C.A.D. 397.]

We conclude, therefore, that the procedural aspects leading up to the promulgation of Presidential Proclamation No. 3108 were con-

ducted in compliance with section 7 of the Trade Agreements Extension Act of 1951, as amended, as that section was interpreted and administered by the President and the Tariff Commission with the knowledge of Congress and with what we find amounted to Congressional assent to this procedure.

The remaining issue is whether, in fixing a rate of duty different from that recommended by the Tariff Commission on one class of bicycles the President acted outside the authority granted to him under section 7 of the Trade Agreements Extension Act of 1951, as amended.

Appellee contended and the Customs Court found that the proclamation with respect to the large wheel lightweight bicycles was outside the authorization given by the statute in that it proclaimed an adjustment in the rate of duty other than that recommended by the Tariff Commission. The specific language of the statute pertinent to this issue is, "the President may make *such adjustments in rates of duty,* * * * as *are found and reported by the Commission* to be necessary to prevent or remedy serious injury * * *." [Emphasis added.] The clear import of this language is that the President *may* proclaim adjustments in rate of duty, but he need not do so. The alternative of disregarding the recommendation and making no changes in existing rates is open to the President. However, if the President decides to make an adjustment in rate of duty, he must proclaim the change which is recommended to him by the Tariff Commission.

Appellant correctly emphasizes that section 7 of the Trade Agreements Extension Act of 1951 is primarily a procedural statute. This statute, commonly referred to as the "escape-clause" provision,[3] defines the manner in which the President must exercise existing powers.

Congress has fixed in section 7 of the Trade Agreements Extension Act of 1951 the limits on the Presidential exercise of the therein delegated powers. He is authorized only to accept or reject the recommendations of the Tariff Commission made pursuant to this section. Were it otherwise, the procedures set up in section 7 would be meaningless. For this reason, we do not agree with the position of counsel for appellant that Congress, in addition, intended that the

---

[3] The "escape-clause" is a clause inserted in trade agreements allowing parties to the agreement to escape from terms of the agreement which cause or threaten serious injury to domestic industry, which effect was unforeseen at the time of the agreement. The statutory procedure may be applied only in cases where the involved trade agreement contains such an "escape-clause." In this case the escape clause involved is that in GATT, 61 Stat. (Part 5) A 59.

The first treaty containing an escape clause was the Mexican trade agreement of 1943. In 1947, Executive Order 9832, 12 Fed. Reg. 1363, declared that every subsequent trade agreement to which the United States is a party must contain an escape clause, and the Order prescribed a procedure whereby the escape clause could be invoked on behalf of American domestic industries.

160

President should have greater discretion and authority under other statutes to achieve the same objectives. Be that as it may, we know of no other statutory provisions by which the President may effect "escape-clause" adjustments and counsel have cited none.[4]

Counsel for appellant have suggested that the President could avoid the "escape-clause" proceedings under section 7 and accomplish the same end by negotiating new terms with foreign nations. This argument overlooks the necessity of involving the peril-point procedures of sections 3 and 4 of the Trade Agreements Extension Act of 1951, as amended. Subsections 3(a)(2) require a special investigation of articles over which there will be negotiations, and which require additional import restrictions to prevent or remedy serious injury to domestic industry. Subsection 4(a)(2) requires the President to report to Congress, specifically identifying the articles subject to a subsection 3(a)(2) investigation, where the recommendations of the Tariff Commission have not been carried out, stating his reason for not carrying out the recommendations. Such a report would then open the way for "escape-clause" action to be initiated by Congress, or for such other action as Congress deems appropriate.

Counsel for appellant also argue that under section 350(a) the President might terminate the previous proclamation at any time. However, we fail to see how this has any bearing upon the argument. The power to terminate his own proclamation can grant no greater discretion to the President than that under which adjustments are proclaimed. The question is one of authority delegated by Congress within the clearly expressed limitations of section 7.

When the Trade Agreements Act of 1951, as amended, is examined as a whole, in light of its expressed purposes, instead of being viewed as a series of disconnected, individual provisions, the reasonableness of providing that the President may either proclaim or refuse to proclaim the adjustments the Tariff Commission recommends is apparent. Congress delegated authority to establish import restrictions by international agreement in order to expand foreign trade. However, the intent to expand foreign trade was motivated by the desire to promote the domestic economy. 19 U.S.C. 1651(1)(a). In order to assure protection for domestic industries, Congress enacted the peril-point procedure of sections 3 and 4 of the Trade Agreements Act of 1951, as amended, requiring a thorough investigation of the

[4] Counsel for appellant argued that a restrictive construction of the statute which allows the President only the alternative of proclaiming the modifications recommended or of disregarding the recommendations limits the powers of the president and that this cannot be done by a procedural statute. This argument ignores the fact that section 7 establishes a particular proceeding for a particular purpose and does not affect any powers granted under other applicable statutes. The President, under section 7 is granted the right to proclaim any restriction within the limits set by Congress, or not to proclaim any new restriction at all. If anything else is done, it must be done according to some other statutory authorization and under the procedure there specified.

articles to be considered in negotiation of an agreement and a report of the investigation prior to the negotiations to inform the Executive departments as to the minimum restrictions which can safely be considered. However, the negotiators retain full discretion, within the limits set by Congress, to agree to any restrictions which they deem best. As described above, special procedures are provided with respect to articles requiring greater protection.

In the event that the extensive proceedings prior to the negotiations fail to provide the minimum necessary protection for domestic industry, Congress provided the "escape-clause" procedures of section 7 to insure correction of the deficiencies in tariff protection. The "escape-clause" provisions of section 7 provide the means by which domestic industry can be protected by executive action. Failure here would be a breakdown of the system of effectuating legislative objectives through specific delegation of authority to the more flexible and specialized administrative and executive agencies, leaving resort only to the pre-1934 procedure of direct legislative action by Congress.

Viewing the Trade Agreements Extension Act of 1951 as a whole, or looking only to section 7 thereof, we are unable to discern any anomalous results from a construction of the language which leaves to the President only the alternatives of proclaiming the recommendations of the Tariff Commission or of refusing to do so. Nor is there any ambiguity in the language of the statute on this point. Our conclusion on this point finds further support in the extrinsic evidence of legislative intent.

Prior to enactment of the first "escape-clause" procedure in the Trade Agreements Extension Act of 1951, 65 Stat. 72, the procedure for invoking the escape-clause was set forth in Executive Order No. 9832, 12 Fed. Reg. 1363.[5] The Executive Order procedure made the recommendations of the Tariff Commission subjects for the President's consideration but the ultimate action was left entirely to the discretion of the President. However, Congress found that procedure to be unfair, ineffective, and unworkable.[6] Two amendments were introduced in the House, one by Mr. Curtis, which would have enacted the existing procedure,[7] and one by Mr. Bailey, which made the recommendations of the Tariff Commission binding upon the President.[8] Mr. Curtis' amendment was rejected, and Mr. Bailey's amendment was passed by the House.[9]

---

[5] Executive Order 9832, 12 Fed. Reg. 1363, was superseded by Executive Order No. 10004, 13 Fed. Reg. 5851, which in turn was superseded by Executive Order No. 10082, 14 Fed. Reg. 6105, but no changes pertinent here were made in the procedure.

[6] H. Rep. No. 14, January 29, 1951, 82d Cong., pp. 22–23, 97 Cong. Rec. 807, 818–821, 835 ; 1075–1076.

[7] 97 Cong. Rec. 1075.

[8] 97 Cong. Rec. 1233.

[9] 97 Cong Rec. 1081 ; for text of Bailey Amendment see 97 Cong. Rec. 1233.

The Senate Finance Committee redrafted the "escape-clause" procedure into substantially its present form.[10] This form of procedure was a compromise, in that it did not bind the President to proclaim every recommendation. However, it did not give the President discretion to proclaim any other modification.[11] With some amendments not pertinent here, the Senate Finance Committee amendment was reported out of Conference Committee and passed by Congress.

In the Trade Agreement Extension Acts of 1953 and 1955 substantially the same language is found. In each of those years, however, Congress again rejected amendments which would have made the recommendations of the Tariff Commission binding upon the President,[12] and also rejected amendments which would have left the President the same discretion as he had prior to 1951.[13]

Neither the committee reports nor the Congressional debates show any Congressional intent that the President should be authorized to proclaim rates other than those recommended by the Tariff Commission. To the contrary, the legislative history indicates that the President may either proclaim what is recommended, or disregard the report of the Tariff Commission altogether.[14] The objective to be achieved by enacting the procedure set forth in section 7 is to restrict arbitrary exercise of the President's powers,[15] and yet to provide through executive action adequate protection for domestic industries.[16] The objectives were to be achieved through the procedures expressly stated in section 7 for limiting the President in the exercise of his powers thereunder.

 The powers of the President with respect to trade agreements are delegated to him by Congress under its Constitutional powers.[17] It requires no elaborate argument to support the proposition that Congress in so delegating its powers may prescribe whatever procedures and limitations it sees fit to enact for limiting the exercise by its agents of such delegated powers.

The language of section 7 of the Trade Agreements Extension Act of 1951, as amended, is clear and unambiguous. The legal result which is contemplated by the plain meaning of the language of the statute appears to be reasonable and consistent with the overall purposes expressed in other sections of the Act.

[10] 97 Cong. Rec. 5493.

[11] See 'S. Rep. No. 299, 82 Cong., 1st Sess., U.S.C. Cong. and Admin. Service, 1951, Vol. 2, pp. 1467–1468, and 97 Cong. Rec. 5494–5496.

[12] In 953 H.R. 5496 ; 101 Cong. Rec. 5562, 5621 (5627).

[13] 99 Cong. Rec. 7922.

[14] 97 Cong. Rec. 5494–5496 ; 99 Cong. Rec. 6535–6536, 6554, 7871 ; 101 Cong. Rec. 1727 et seq., 8169 et seq. S. Rept. No. 472, 83d Cong., 1st Sess. ; U.S.C. Cong. & Admin. News, 1953, p. 2187.

[15] 97 Cong. Rec. 5495–6.

[16] 97 Cong Rec. 807–821, 1075–1081, 5494 et seq.

[17] Star-Kist Foods, Inc. v. The United States (Bruno Scheidt, Inc., Party in Interest), 47 CCPA 52, C.A.D. 728, and authority cited therein.

As we have shown above, the legislative history of the "escape-clause" procedure supports the plain meaning of the language used in the statute. We hold, therefore, that insofar as Presidential Proclamation No. 3018 sets a rate of duty on the class of bicycles here in issue other than that recommended by the Tariff Commission, it exceeds the authority delegated to the President and such portion of the proclamation is void.

The judgment of the Customs Court is *affirmed*.

MARTIN, J. was not present at the hearing and did not participate in the decision.

WORLEY, Chief Judge, concurring.

In my opinion the record clearly supports the holding of the Customs Court that the procedure followed by the President did not comply with the requirements of Section 7(a) of the Trade Agreements Extension Act of 1951. I would affirm the judgment in its entirety.