DOLLIFF & COMPANY, Inc.

v.

UNITED STATES.

C.D. 4158;  Protest No. 65/22497–19364.

United States Customs Court,
First Division.

Dec. 31, 1970.

Classified under:

Schedule 7, part 1, subpart A

"Footwear, of leather (except footwear with uppers of fibers):

\* \* \* \* \* \* \*

   Other:

\* \* \* \* \* \* \*

700.40    For other persons ........20% ad val."

Claimed under:

Schedule 7, part 1, subpart A

"Footwear, of leather (except footwear with uppers of fibers):

700.30    Footwear with molded soles laced to uppers ........10% ad val."

Walter E. Doherty, Jr., Boston, Mass., for the plaintiff.

L. Patrick Gray, III, Asst. Atty. Gen. (Patrick D. Gill and Gilbert Lee Sandler, New York City, trial attys.), for the defendant.

Before WATSON, MALETZ, and RE, Judges.

RE, Judge:

The legal question presented in this case pertains to the proper classification, for customs duty purposes, of certain leather shoes imported from Italy. They were classified by the customs officials as "footwear, of leather \* \* \* for other persons (than men, youths, and boys)" under item 700.40 of the Tariff Schedules of the United States, and were therefore assessed with duty at the rate of 20 per centum ad valorem. Plaintiff has protested this classification, and claims that the shoes are properly and legally classifiable as "footwear of leather \* \* \* with molded soles laced to uppers", under item 700.30 of the tariff schedules at the rate of 10 per centum ad valorem.

For purposes of convenience the pertinent provisions of the Tariff Schedules of the United States may be set forth as follows:

It was stipulated at the trial that the footwear, the subject of this case, is in chief value of leather, that the uppers are not fibers, and that it has molded soles. Having thus narrowed the issue, as observed by the trial judge, "\* \* \* the controversy relates to whether or not those soles are laced to the uppers." The single issue to be resolved, therefore, is whether the footwear in question has soles which are "laced" to the uppers within the meaning of item 700.30 of the Tariff Schedules of the United States.

At the trial, in addition to certain exhibits, plaintiff called two witnesses, and the defendant called three. Defendant's sole exhibit consisted of a pamphlet "prepared for the footwear industry" by the National Shoe Manufacturers Association, Inc. entitled "Footwear Construction Definitions". This pamphlet, which is dated April 1963, states in its foreword that the definitions that it contains "are the result of over six months of study by industry experts."

To assist in illustrating what it claims to be a "lacing process", the plaintiff introduced into evidence a shoe, representative of the importation, with "certain lacings or threads or yarns" removed on the left side to show the method by which the molded sole was attached to the upper. For the same purpose, plaintiff also introduced a shoe with some of the threads pulled out of the sole, where the sole is attached to the upper, with bristles at the end of the threads. A witness for the plaintiff explained that

the "reason for applying the bristles to the end of the thread or lacing is to provide a semi-rigid leader which can find its way through the holes in the two pieces of material, one being the sole and the other being the upper." This witness added that it "would be impossible to force a thread or lacing through without something to lead it." He described the process for the making of these shoes as follows:

"The sole is cut to shape, the edges. are skived, the holes are punched. It is then placed in a heated aluminum male and female mold which shapes it exactly to the shoe body. Then by means of a temporary cement the molded sole is placed onto the bottom of the shoe and then through the pre-punched holes by means of bristle leaders and an awl to line up the holes the operator simply laces the edge of the sole to the upper."

The witness stated that, in the sole-attaching process, a needle is never used. An awl is used, not to push through the bristles, but "to find through the hole in the sole to the hole in the upper and line them up quickly so that the bristles may pass through." All of the shoes in question are made in this manner.

The method of attaching the sole to the upper was described as follows by the manufacturer of the shoes:

"Since 1963 we have used the process of lacing soles to uppers by means of drawing waxed thread attached to pig bristles, which we force through the pre-punched holes in the soles and pull through the uppers in a cross stitch."

■ Not only have the parties agreed that the single issue to be decided is whether the soles of the shoes at issue were laced to the uppers, but it is also agreed that the determination is to be based upon the common meaning of the word "laced". Indeed, plaintiff states in its brief that it "insists that this is a situation where the common meaning controls." Specifically, therefore, the question presented is whether the process described, whereby the sole of the shoe is attached to the upper, constitutes "lacing" within the pertinent tariff schedule provision.

■ It is, of course, well established that the common meaning of a word is "a matter of law to be determined by the court, for which purpose the court may consult dictionaries and other authorities, may receive the testimony of witnesses, which is advisory only, and may rely upon its own knowledge." Norbert Stryer v. United States, 62 Cust.Ct. 598, 602, C.D. 3831 (1969).

■ In a customs classification case it is well to remember the burden that the plaintiff must discharge in order to prevail. Citation of authority is hardly required for the proposition that the classification assigned by the customs officials is presumed to be correct. It is equally fundamental that there falls upon the plaintiff the dual burden of proving not only that the assigned classification is erroneous, but also that the claimed classification is correct. Hence, in the case at bar, the question to be decided is whether the plaintiff has proven that the soles are "laced" to the uppers. This point requires mention because it must be understood that there is no burden upon the defendant to prove that the shoes have been attached by a process other than lacing. For example, the defendant need not prove that the soles have been sewn or cemented to the uppers.

On the record before it, the court holds that the plaintiff has not sustained its dual burden in proving that the assigned classification is erroneous, and that the shoes in question should have been classified as claimed.

Plaintiff's witnesses and the exhibits establish that the attachment process in question consisted of pre-punching holes in the soles and uppers of the shoes, cementing the soles to the uppers, passing an awl through the holes, pushing or forcing waxed threads with pig bristle leaders through the holes, and pulling the threads through in a cross-stitch.

One of plaintiff's witnesses testified that the process was similar to a lacing of one's shoes. In its brief plaintiff asserts that "[t]he process is extremely similar to, if not identical with, the lacing up of a pair of shoes which we all are familiar with daily. In that case the shoelace usually has a metal or plastic tip to facilitate the process, and an awl does not have to be used to line up the holes because the shoelace eyelets in the shoes are designed for easy use of the laces." (Plaintiff's brief, p. 15).

An examination of the physical exhibits will show that the analogy to the lacing of one's shoes is far-fetched. It is accurate only insofar as there are pre-punched holes, and a lace or thread may be pulled through. There is, however, a vast difference in the method, complexity, and skill required. Indeed, when asked to demonstrate the process, plaintiff's witness, who "had much to do with the design and development" of the shoe and knew "every operation involved" in producing the shoes, stated that he could not do so. He replied that he could not demonstrate the "lacing", that is, the manner in which the bristle leaders were passed through the pre-punched holes, "without tools", and also because the shoe "needs to be on a last."

More particularly, this witness stated that he could not demonstrate the attachment process because he did not have an awl, but volunteered to "explain". The "awl", the tool required by the witness, is described in Webster's Third New International Dictionary, 1968 edition, as "a pointed instrument for marking surfaces or piercing small holes (as in leather or wood), the blade being differently shaped and pointed for different uses." Two illustrations are set forth. Illustration "1", with a straight point, is entitled "awl", and illustration "2", with a slightly bent or curved point and a somewhat different handle, is called "sewing awl."

Defendant, in its brief, asserts that none of the operations, by which the sole of the shoe is attached to the uppers,

"except pre-punching", is "present in the common understanding of the procedure known as 'lacing'." Indeed, defendant submits that "the attachment process at issue is a *handsewing* operation, and that to include the subject shoes in the provision for footwear with molded soles laced to uppers would violate the purpose and intention of item 700.30." [Emphasis in original.] (Defendant's brief, p. 14)

Although it is not its burden to establish that the attachment process constitutes "sewing", rather than "lacing", the defendant nevertheless submits that the shoes at issue were not "laced" within the meaning and purpose of item 700.30 of the tariff schedules, but were "hand-sewn". In support of its position, in addition to the legislative history of the pertinent tariff item, the defendant refers to the pamphlet entitled "Footwear Construction Definitions". As stated in its foreword, this pamphlet is a "dictionary of simple footwear construction definitions", that "tries to overcome the problem of technical descriptions for non-technical people." It would seem clear from the foreword that the pamphlet attempts to reflect the commonly understood meanings of footwear construction terms "in plain English descriptions" during a period of more than six months prior to the date of its issuance in April 1963.

On page 11 of the pamphlet there is found an illustration and a description of "footwear with molded soles laced to uppers". This category of footwear is described as follows:

"This construction has an upturned molded sole laced to the upper. An extended edge of the sole is molded so as to turn up and encase the lower portion of the foot. The edges of this upturned sole extension and of the upper material have perforations or holes which are pre-cut with a die, or in some other manner, before the assembly operation begins. It is through these holes that the lacing material is passed in order to attach the sole to the upper."

The last paragraph of the textual matter pertains specifically to the manner of lacing and states:

"Another distinguishing feature of this construction is the manner of lacing. The material must be reeved round and round through the holes. In other words, the handsewn type of stitching where the threads are passed through from both sides, and crossing in the holes, is not regarded as lacing, but strictly as 'handsewn.' Further, lockstitching, whether or not it be done through pre-cut holes, would not be considered lacing."

As revealed by the testimony, and the statement of the manufacturer, the soles and uppers of the shoes at bar were not attached by reeving material "round and round through the holes". The method actually utilized is cross-stitching, a process specifically distinguished and expressly excluded from the category of "footwear with molded soles laced to uppers".

The dictionary definitions of the words "lace", "laced", "lacing", "sew", and "stitch", set forth in plaintiff's brief, do not support the contention that the attachment process in issue is "lacing" rather than "sewing". Clearly none of them describes the total process or all of the operations involved in attaching the molded soles to the uppers of the shoes before the court.

The defendant also notes that there are no definitions before the court which would indicate that a process which requires or employs a cementing operation, and the use of an awl as a prerequisite to cross-stitching, falls within the common meaning of lacing.

The following definitions from Webster's Third New International Dictionary, 1968 edition, are illustrative:

"Lace—1: to draw together the edges of by or as if by means of a lace passed through eyelet holes: TIE—often used with *up* [*laced* up their shoes] 2: to twine, draw, or pass as a lace: THREAD, INTERTWINE, EMBROIDER 3: to confine or compress by tightening laces esp. of a corset * * *."

"Sew * * * 1—to unite, attach, or fasten by stitches made with a flexible thread or filament * * * 2: to secure together (the sections of an assembled book) with thread or wire—distinguished from *stitch* * * *."

"Stitch—*n*. * * * 2: a single complete in-and-out movement of a threaded needle in sewing, embroidering or suturing * * *."

"Stitch—*vb* * * * 2a(1): to fasten, join, or close with or as if with stitches * * * (2): to fasten together (signatures) by passing thread or wire through all the signatures at once—distinguished from sew * * * 2d: to sew by first puncturing (as shoe leather) with an awl or needle by hand or by machine * * *."

From these, and other definitions examined, one may conclude that it is sewing, or the sewing process, that requires that stitches be used in uniting, attaching, or fastening. For example, the definition given in Webster's Third New International Dictionary, 1968 edition, for a "Sewed Shoe", states that it is "a shoe in which the upper is attached to the sole by stitching."

In support of its contention that the attaching process in issue is lacing, and not sewing, plaintiff places reliance upon and quotes extensively from the case of Amberg, Schwab & Co., Inc., et al. v. United States, 64 Treas. Dec. 433, T.D. 46701 (1933). The *Amberg, Schwab & Co.* case pertained to the proper classification of certain hats, bonnets and hoods under the Tariff Act of 1930. The sole question presented was whether or not they were "sewed", and the court noted that what constituted "sewing" was a question of novel impression. Since the parties made no attempt to establish commercial designation the court relied upon the common meaning of the word "sewed". The court quoted from the plaintiff's brief the manufacturing process by which the

hats were made. After a consideration of certain dictionary definitions, and the varieties of straw hats, the court concluded that the process described did "not rise to the dignity of sewing", and held that the hats were not "sewed".

The attachment process in the *Amberg, Schwab & Co,* case need not be detailed here since it is not sufficiently analogous or similar to the process used in the case at bar to attach the soles of the shoes to the uppers. In the *Amberg, Schwab & Co.* case the court observed that to give the word "sew" the broad construction claimed by the defendant "would practically, if not entirely, nullify the congressional distinction" between hats that are sewed and those that are not sewed. The statements of the court, therefore, on the meaning of the word "sew" must be read in relation to the statutory construction problems presented in that case.

As stated by the court:

"To give to the word 'sew' its broadest construction, under the definitions hereinbefore quoted, would practically, if not entirely, nullify the congressional distinction, so plainly manifest in said paragraph 1504, between hats, bonnets, and hoods, sewed, and hats, bonnets, and hoods, not sewed." 64 Treas.Dec. at 436.

The dictionary definitions of "sew", which are essentially the same today, were summarized as follows:

"It is apparent from the foregoing definitions of the word 'sew' that there must be employed 'stitches.' Some of these definitions of the word 'sew' state that it may be accomplished with a needle or awl, while other definitions state that sewing may be accomplished with or without the aid of a needle, awl, or other tool." 64 Treas.Dec. at 435.

It would seem clear, therefore, that the court, in the *Amberg, Schwab & Co.* case, gave the word "sew" a more restrictive scope than warranted by the common meaning of the word, in order to effectuate the congressional intent manifested in the pertinent provision of the Tariff Act of 1930.

The *Amberg, Schwab & Co.* case contains no definition of the word "sewing" or "sew" that can resolve the issue in a case where the question is whether molded soles of shoes are "laced to the uppers". Also, since the question there was whether the hats were "sewn", any statements on the meaning of "lace" or "lacing" are dicta and likewise not dispositive of the present issue. Although the analysis in the *Amberg, Schwab & Co.* case proved to be helpful in determining whether the hats therein were "sewed" or "woven", it sheds but little light upon the classification of the shoes in question. See also Morris Shoenthal, Inc. v. United States, 52 Cust.Ct. 36, C. D. 2431 (1964) (ramie artificial silk hats held to be woven and not sewed).

Interestingly enough, in the *Amberg, Schwab & Co.* case the court referred specifically to the lacing of one's shoes as follows:

"A shoe string when inserted through the eyelets of a shoe certainly passes through a portion of the shoe itself, but no one would ever designate the lacing of a shoe as a sewing operation." 64 Treas.Dec. at 438.

No one can doubt that the lacing of shoes, referred to in the various definitions and mentioned by the court, refers to the usual and ordinary lacing of the uppers of one's shoes, and not to any attachment process as complex as the one described in the case at bar.

Both this court and the Court of Customs and Patent Appeals have had occasion to consider a type of footwear known as "huaraches" which involves a lacing process. Huaraches, insofar as relevant here, pursuant to a definition adopted by the courts, are "leather-soled sandals having woven-leather uppers laced to the insole." Although huaraches have generated considerable judicial inquiry, none of the cases examined was concerned with the process of lacing. It was not questioned that the huaraches, that were the subject of those cases,

contained a lacing process, e. g., leather thongs laced to the insole.

The question presented in the huaraches cases was whether the footwear met the requirement of the definition that provided for *woven-leather* uppers. The meaning of the word "huaraches" was considered by the Court of Customs and Patent Appeals in United States v. Weigert-Dagen et al., 39 CCPA 58, C.A. D. 464 (1951). In the case of United States v. Fuchs Shoe Corporation, 41 CCPA 179, C.A.D. 547 (1953), that court determined that the requirement of "Woven-leather uppers" meant that the uppers had to be *wholly* woven-leather. In United Staes v. A. J. Taylor of Santa Fe, New Mexico, 48 CCPA 97, C. A.D. 772 (1961), the question whether the footwear, the subject of that action, consisted of huaraches was raised anew, but the process of lacing again was not in issue. Consequently, no judicial precedent has been found which has provided guidance in determining the common meaning of the word "lace" or "lacing".

At the trial plaintiff introduced into evidence a letter dated May 17, 1963 from the Bureau of Customs "with respect to the probable position of this merchandise under the proposed revised tariff schedules of the United States." This letter was submitted in response to plaintiff's request for an advisory classification for shoes similar to those at bar, but from a prior importation. The letter states:

"Customs can make no binding decision as to classification of articles under the new Tariff Schedules of the United States because those schedules are not in effect. These schedules will go into effect not earlier than August 31, 1963.

If item 700.30 becomes effective in its present form, it appears probable that after the effective date of the new schedules, this merchandise will be dutiable at the rate of 10 percent ad valorem."

■ Although plaintiff admits that the Bureau of Customs is not bound by the quoted expression of opinion, it suggests that it "should have great weight in determining the TSUS classification." In this instance, the court can not agree since the legislative history of item 700.-30 shows that it is a reenactment of a trade agreement provision intended to encompass a limited category of shoes. See 73 Treas.Dec. 454, T.D. 49458 (1938); 74 Treas.Dec. 395, T.D. 49824 (1939); 82 Treas.Dec. 305, T.D. 51802 (1947).

The category of shoes "having molded soles laced to uppers" first appeared in the 1938 Trade Agreement with Czechoslovakia. In a Tariff Commission document which refers to the trade agreement, and the reduction of duty from 20 percent to 10 percent, this particular class of "leather soled footwear" is listed as "molded sole leather sandals." Digests of Trade Data, Trade Agreement Between the United States and the Czechoslovak Republic (1938), p. 181. That publication, under the heading of "competitive conditions", indicates the effect of the provision on domestic production in the following words:

"*Molded sole sandals* are imported only from Czechoslovakia. This type of shoe is not made in the United States but the imported product competes with beach sandals and other lightweight women's summer shoes made in this country." [Emphasis in original.] (p. 201)

Plaintiff has referred to the Tariff Commission's Summaries of Tariff Information, Volume 15, Part 6, (1948) wherein, at page 115, there is a "comment" upon "leather boots and shoes and other leather footwear". It states that the several kinds of shoes therein included are "distinguished from each other by the various processes of attaching the soles to the uppers." The fourth category listed is "the molded-sole which consists of lacing by hand and upwardly curved outsole to the upper". In the very next paragraph, however, it is in-

dicated that "molded-sole shoes, which have the appearance of sandals, are principally for women's summer wear."

The manner in which this category of footwear is mentioned in the Tariff Commission's Tariff Classification Study, Explanatory and Background Materials (1960) also leads to the conclusion that it pertained to a limited category. At the hearings before the Tariff Commission, which preceded the adoption of the Tariff Schedules of the United States, only a passing mention was made of item 700.30, i. e., the category of footwear "with molded soles laced to the uppers". The only reference to that category was made by Mr. Field, representing the New England Shoe and Leather Association, who stated:

> "Then we have a category of 'Having Molded Soles Laced to Uppers.' *That is insignificant."* [Emphasis added.] Tariff Classification Study, Explanatory and Background Materials, Schedule 7 (1960) at p. 646.

It is also to be noted that elaboration was not necessary in the "explanatory notes" since their purpose was to comply with the requirement of the Customs Simplification Act that the Tariff Commission publish a summary of data relied upon, and a statement of probable effect, where there was a rate change. *Id.* at page XI. No statement was required in reenacting a provision without a change of rate. It is consequently important to read the statement that the pertinent category of shoes was deemed to be "insignificant".

It can not be disputed that the shoes at bar are not sandals, do not have the appearance of sandals, and are not principally for women's summer wear. They are leather golf shoes. It is not denied that in the trade the shoe in issue is known as a calfskin or side leather plaintoe blucher oxford with a molded sole.

It would appear clear from the foregoing that the court can not give the word "laced" the broad or expansive meaning urged by the plaintiff. Such a construction would do violence to the history and purpose of item 700.30 of the Tariff Schedules of the United States.

From the testimony and an examination of the exhibits the court concludes that the shoes at bar are not footwear with molded soles laced to the uppers within the meaning of item 700.30 of the Tariff Schedules of the United States.

In view of the foregoing, it is the determination of the court that the leather shoes, the subject of this action, have been properly and legally classified. The protest is consequently overruled.

Judgment will issue accordingly.