(C.D. 4363)

FOOT WIN SHOE CORPORATION *v.* UNITED STATES

United States Customs Court, First Division

(Decided July 3, 1972)

*Barnes, Richardson & Colburn* (*Rufus E. Jarman, Jr.,* and *Irving Levine* of counsel) for the plaintiff.
*Harlington Wood, Jr.,* Acting Assistant Attorney General (*Frederick L. Ikenson* and *Martin L. Rothstein,* trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: The question in this case concerns the proper tariff classification of certain footwear described on the invoices as "Squaw boot softie" that was imported from Mexico and entered at the port of Laredo, Texas. The footwear was classified under item 700.43 of the tariff schedules, as modified by T.D. 68–9, as other leather footwear and assessed duty at 19 percent ad valorem. Plaintiff alleges that this classification is erroneous and claims that the imported footwear is properly dutiable at 9 percent ad valorem under item 700.30,

as modified by T.D. 68–9, which provides for leather footwear with molded soles laced to uppers.

The relevant provisions of the tariff schedules read:

Classified under:

Footwear, of leather (except footwear with uppers of fibers):

\* \* \* \* \* \* \*

Other:

\* \* \*   For men, youths, and boys_____   \* \* \*

\* \* \* \* \* \* \*

For other persons:

\* \* \* \* \* \* \*

Other:

700.43   Valued not over $2.50 per pair_____   19% ad val.

Claimed under:

Footwear, of leather (except footwear with uppers of fibers):

\* \* \* \* \* \* \*

700.30   Footwear with molded soles laced to uppers _____   9% ad val.

The parties have stipulated that the footwear is of leather and that the soles are laced to the uppers. Thus (as the parties agree), the single issue in this case is whether the imported footwear has "molded soles" within the meaning of item 700.30.

Plaintiff called two witnesses, the first of whom was Robert Lipson, the general manager of plaintiff, Foot Win Shoe Corp. (Foot Win), a division of the Desco Shoe Corporation of New York (Desco). Its second witness was Samuel L. Asch, vice-president of Desco. Defendant's witness was Martin Nadler, the president of Jo-An Manufacturing Company, Inc. (Jo–An), a manufacturer of all types of moccasin footwear. All the witnesses have had extensive experience in the leather footwear industry, including the manufacture and sale of "squaw boot softies".[1]

---

[1] In this connection, plaintiff's witness Lipson, the general manager of Foot Win, has served in a wide range of capacities for footwear companies for 24 years, and at the time of trial had complete responsibility for the manufacture in Mexico of footwear, including that in issue, by Calzado Desco, a company controlled by Desco. His duties included styling, sales, handling of accounts, dealing with suppliers and supervising the manufacturing operation.

Plaintiff's second witness, Asch, vice-president of Desco, has been in the footwear business for 42 years and has supervised the manufacture of shoes and styled and designed footwear. He became familiar with molded sole footwear 42 years ago as his first employer, Golo Footwear Corporation, had imported millions of pairs of molded sole shoes known as "Opankin" from Czechoslovakia during the period from 1928 through 1932, and he had

While defendant's witness differed sharply with plaintiff's witnesses over whether the articles in question have molded soles, there were certain areas upon which all were in general agreement. Thus it appears from the testimony that the shoe industry first applied the term "molded sole" to leather soles which are molded to conform to the bottom of the last or foot, and also curl up around the edges. These soles are either hand laced or cemented by various processes to the uppers.

In the 1920's and 1930's, the term "molded soles" referred only to a type of footwear known as the Opankin which was made in Czechoslovakia and imported into the United States. The Opankin originally was molded by hand in the following way: The sole leather was made wet and pliable, and the worker then wrapped this leather by hand over the last to get the edging that is seen on the molded sole. The uppers were made of individual eight-inch wide leather strands that were woven from one side to the other through pre-cut holes in the sole. Subsequently, the process was modernized and the hand lasting was replaced by the so-called brother-sister cooperating mold, also known as the concave-convex system. This method was described by plaintiff's witness Asch (R. 88–89):

> * * * They would make a brother and sister last. There was an upper and there was a bottom. The upper would fit into the bottom portion, and the bottom portion was flanged on the sides, and it would press down into the leather that was made soft and pliable, and the leather was brought up on the sides. The lasts were heated and they would be trimmed around the top of the flange. That's the way the soles were made. They were made separate. Then they were given to somebody to do other things with.

Whether produced by the hand-lasting or brother-sister method, the soles were permanently molded to retain their shape.

In recent years, with the development of rubber and plastic materials, the term "molded" has been broadened by the shoe industry to refer also to soles which have been manufactured in a mold and which need not necessarily conform to the shape of the foot. These include contour inner soles and outer soles produced by vulcanization or in an injection-type molding machine.

The squaw boots in issue are produced by a different method from those described above. At Calzado Desco, the various parts which make

---

observed their manufacture in that country. The Opankin was imported by others into the United States until 1938 or 1939; Asch saw that shoe again in Czechoslovakia in 1947.

Defendant's witness, Nadler, president of Jo-An, has been with that company for 23 years. His duties have included all phases of production, purchasing of equipment and pattern design, in addition to financing, selling and administration. His company, which manufactures squaw boots, formerly produced hand-laced squaw boots using a method identical in principle to that employed in making the articles in question and which were identical in appearance to them. The company now uses a patented process of manufacture which eliminates the necessity of using handwork. He is also familiar with the Czechoslovakian Opankin shoe.

up the imported shoe, i.e., a two-piece collar, a two-piece upper, the lace and the sole, are cut mechanically from whole leather skins. The pieces are then inspected, stamped with sizes and the "Made in Mexico" legend, and all portions, except the sole, are assembled and stitched together. These operations produce a complete upper. The soles, which have prepunched holes, are then hand laced to the uppers.

The articles are then placed on shoe lasts and put into special ovens which "heat, set or form or mold the shoe * * * actually molding the upper and the sole together." (R. 20) The shoes remain in the ovens for 30 to 45 minutes at a temperature which reaches 200 degrees. During this period, they are predried, shock dampened and redried. It is this treatment which gives the shoes their "unusual forming or molding." (R. 21) Thus the shoes acquire a permanent shape while in the ovens. After removal from the ovens, the lasts are taken out and "sock linings" are inserted inside the shoes, which are then cleaned, trimmed and boxed.

If the shoe is disassembled, the sole by itself will retain its shape more or less permanently, subject to normal deterioration from humidity, time and temperature.

The witness Lipson testified that the phrase "molded sole laced to upper" is not generally used in the shoe manufacturing industry as it is not a common product. However, his firm, which began to manufacture the squaw boots by the process described here around 1967 or 1968, used that term as a selling point to market them. He remembered seeing an advertisement for Opankin-type shoes which used that phrase and recalled that Saks Fifth Avenue advertised Italian-made shoes with molded soles. He also recalled seeing a catalogue of an American manufacturer of squaw boots which referred to the merchandise as "molded to the foot". Lipson stated that the imported boots are one type of molded sole footwear; the other type has the sole cemented to the upper.

Plaintiff's second witness, Asch, stated that, in his opinion, the shoe in issue and the Opankin have true molded soles.

Defendant's witness, Nadler, testified that he had never known the term "molded soles" to be used with reference to articles such as the present importations, although it has been used to refer to other squaw boots where the sole is made from a vegetable tanned sole leather by the brother-sister or concave-convex principle prior to being fastened to the upper. All molded soles, he stated, are hard "like a board" (R. 147) because of the type of leather used and the molding process.

The leather used for the imported squaw boot soles, he said, is glove tanned leather which is soft and pliable. In his opinion, the soles in the importations are not molded, as that term is used in the trade, since they are "contrary to the whole concept of a squaw boot which

is supposed to be soft and comfortable." (R. 138–39) Leather molded soles, according to Nadler, are either molded on a last or in a brother-sister machine prior, in most cases, to being laced to the upper. However, he knows of some instances where the uppers are attached simultaneously with the molding process.

In urging their respective positions, both parties rely upon the legislative history of the term "molded soles laced to uppers" appearing in item 700.30.[2] The term first appeared in the tariff classification schedules when it was carved out of paragraph 1530(e) of the Tariff Act of 1930[3] by the 1938 Trade Agreement with Czechoslovakia (T.D. 49458) which reduced the rate of duty on leather footwear "having molded soles laced to uppers" from 20 to 10 percent.

With respect to this duty reduction, the Tariff Commission stated in *Digests of Trade Data, Trade Agreement Between the United States and the Czechoslovak Republic* (1938), p. 195, that:

> * * * Molded sole sandals have been next in importance. In import statistics, shoes with soles attached by the cement process and molded sole sandals are shown under the classification "other" methods of manufacture. Prior to 1936, imports in this classification consisted chiefly of molded sole sandals. Imports of molded sole sandals amounted to about 300,000 pairs annually in 1936 and 1937.

The Commission noted further (*id.* at p. 201):

> Molded sole sandals are imported only from Czechoslovakia. This type of shoe is not made in the United States but the imported product competes with beach sandals and other lightweight women's summer shoes made in this country.

The 1938 trade agreement was terminated a year later due to the cessation of trade with Czechoslovakia following the German take-over of that country at the outset of World War II. See T.D. 49824. After the war, the provision for footwear having "molded soles laced to uppers" reemerged in 1948 in the General Agreement on Tariffs and Trade (T.D. 51802) to which Czechoslovakia was a signatory. Under this agreement, the rate of duty on this type of footwear was again reduced to 10 percent. Commenting on the provision for "molded shoes", the *Summaries of Tariff Information* (1948), Vol. 15, Part 6, prepared by the Tariff Commission, had the following to say (pp. 115–16):

> * * * The several kinds of shoes here included are distinguished from each other by the various processes of attaching the soles

---

[2] For a succinct discussion of the legislative history of item 700.30 see *Dolliff & Company, Inc. v. United States,* 65 Cust. Ct. 681, 689–91, C.D. 4158, 319 F. Supp. 1392, 1398–99 (1970), *aff'd* 59 CCPA 101, C.A.D. 1047 (1972).

[3] Paragraph 1530(e) provided for "[b]oots, shoes or other footwear (including athletic or sporting boots and shoes) made wholly or in chief value of leather, not specially provided for."

to the uppers. The most important of these processes are: * * * (4) the molded-sole, which consists of lacing by hand an upwardly curved outsole to the upper; * * *.

* * * Molded-sole shoes, which have the appearance of sandals, are principally for women's summer wear. * * *

\* \* \* \* \* \* \*

* * * The imports in 1937 consisted of cemented, nailed, and stitchdown shoes, and sandals with molded soles laced to uppers. Czechoslovakia was the principal foreign supplier at that time * * *.

Finally, it is to be observed that the provision for "[f]ootwear with molded soles laced to uppers" was carried over—as item 700.30—into the schedules adopted by the Tariff Classification Act of 1962 (P.L. 87–456, 76 Stat. 72). The *Tariff Classification Study, Explanatory and Background Materials, Schedule 7*, November 15, 1960, p. 21, merely notes with respect to this provision that "footwear with molded soles laced to uppers (item 700.30) involve[s] no rate changes."

Against this background, the parties agree that the Opankin shoe was the basis for the original modification in the 1938 Czechoslovakian Trade Agreement of the duty rate on footwear having molded soles laced to uppers. Plaintiff relies upon this to argue that the imported squaw boots, like the Opankin, are "lightweight women's summer type shoes."[4] It contends though that item 700.30, regardless of its origin, is not limited to the Opankin style but covers all leather shoes having molded soles which are laced to uppers.

Defendant claims, on the other hand, that the footwear covered by item 700.30 is limited to (1) women's summer-type sandals with (2) soles made of "hardened sole leather" which have (3) been molded prior to attachment by lacing to the uppers; and that the imported shoes in question meet none of these criteria.

For the reasons that follow, we agree with defendant's last contention and, therefore, need not reach the question as to whether item 700.30 is limited to footwear of a particular style or leather.

As we read the provision in issue, particularly in the context of its legislative history, we think it clear that the term "molded soles laced to uppers" contemplates a sole that has been molded prior to its being laced to the upper. For one thing, the 1948 *Summaries of Tariff Information, supra*, at p. 115, refers to the "molded-sole, which consists of lacing by hand an *upwardly curved* outsole to the upper". [Emphasis added.] Even more telling is the explanation in the *Trade Agreement*

---

[4] Exhibits 1 and 2, offered as representative of the imported merchandise, somewhat resemble soft, pliable "moccasin style" footwear. The soles, which are slightly contoured, come up about one-half inch over the edge of the foot and are laced to the uppers. When the witness Lipson removed the sock lining from exhibit 2 and detached the sole from the upper, both portions, denominated exhibits 2A and 2B, retained their shape.

*Digests* (1946), prepared by the Tariff Commission, which states, Vol. 15, Part 2, p. 60:

> In *molded leather-sole shoes*, the upper is laced to the outsole, which *has been molded* to curve upward to conform to the shape of the foot. Holes are punched at spaces of about one-fourth inch apart, in the top of the *curved up portion of the sole* and the upper is laced to the sole by hand. The heel is nailed on, and for comfort and appearance the inside of the sole is covered with a sock lining. These shoes, frequently known as sandals, are worn by women for summer wear. [Emphasis added in part.]

In short, these two publications indicate that the term "molded soles laced to uppers" denotes an assembly process in which the sole is molded *prior* to attachment to the upper. Added to this, there is evidence in the record demonstrating that this interpretation comports with the trade meaning of the term. Thus, a pamphlet (plaintiff's exhibit 5), entitled *Footwear Construction Definitions*, prepared by the National Shoe Manufacturers Association, Inc. in 1963 and which, the parties stipulated, has been circulated throughout the shoe industry in the United States,[5] includes, on p. 11, a description with an accompanying illustration of "footwear with molded soles laced to uppers." The text reads as follows:

> This construction has an upturned molded sole laced to the upper. An extended edge of the sole is molded so as to turn up and encase the lower portion of the foot. The edges of this *upturned sole extension* and of the upper material have perforations or holes which are pre-cut with a die, or in some other manner, *before the assembly operation begins*. It is through these holes that the lacing material is passed in order to attach the sole to the upper.
>
> If the upper consists of straps, the lacing must pass through *both the edges of the upturned sole* and strap where they meet.[6]
>
> [Emphasis added.]

What is more, there is not a scintilla of evidence in the record to indicate that, apart from plaintiff's own advertising, the shoe industry's understanding of the term "molded soles laced to uppers", as set out in plaintiff's exhibit 5, has been modified or revised to en-

---

[5] It is to be noted that this same pamphlet was cited by our court of appeals as evidence of trade understanding, *Dolliff & Company, Inc.* v. *United States,* 59 CCPA 101, C.A.D. 1047 (1972) (slip op. at p. 5). *Dolliff,* it should be added, also involved the interpretation of item 700.30 but was concerned with the meaning of the term "laced" as used therein. More specifically, the question in that case involved the classification of a shoe, the sole of which was cut, skived around the edges, prepunched with holes, placed in a heated male and female mold which shaped it exactly to the shoe body, *after which* it was attached to the upper.

[6] One of the express purposes of this pamphlet, plaintiff's witness Lipson stated, "was to help the United States Customs Department with definitions." (R. 34) Subsequently, when asked on cross-examination if the definition of footwear with molded soles laced to uppers, as set out in the National Shoe Manufacturers Association pamphlet, was intended to describe a shoe where the sole was first molded or turned up and then laced to the upper, Lipson responded: "It leaves me confused." (R. 75)

compass footwear which has been molded *after* lacing the uppers to the soles.

From what has been said, it is apparent that the term "molded soles laced to uppers," as used by Congress and as understood in the trade, contemplates the lacing of a preexisting molded sole to an upper. Such conclusion in no way represents an application of the "preexisting material" doctrine, as urged by plaintiff,[7] but recognizes instead that the applicable tariff and commercial definitions of "molded soles laced to uppers" describe *a particular mode of assembly*.

In this setting, the testimony clearly shows that the soles of the footwear in issue were not molded prior to lacing and that, in fact, the process employed herein treated not the sole but rather the shoe itself. Actually, plaintiff recognized this distinction when, describing the so-called molding or shaping process, it stated in its brief (pp. 5–6) that after the upper and sole are laced together—

> The article is then placed on a last which is a form similar to a foot, and placed in special Italian ovens which mold the shoe. * * *
>
> \* \* \* \* \* \* \*
>
> The treatment of the *shoe* in the oven gives the *shoe* a permanent shape. * * * [Emphasis added.]

As the witness Lipson stated (R. 20):

> * * * These ovens heat, set or form or mold the shoe. We are actually molding the upper and the sole together.

For the reasons stated, we hold that the imported squaw boots, which were treated or "molded" after the soles and uppers were laced together, are not "[f]ootwear with molded soles laced to uppers" within the meaning and intendment of item 700.30.

The protests are overruled and judgment will be entered accordingly.

(C.D. 4364)

---

[7] The "preexisting material" doctrine is a "judicial rule of construction to the effect that, before a given article can be said to be 'made', 'manufactured' or 'composed' wholly or in part 'of' a given material \* \* \* that material itself must first be in existence." *Jacques Isler Corp.* v. *United States,* 58 CCPA 22, 24, C.A.D. 999 (1970).