UNITED STATES *v*. ARMAND SCHWAB & CO., INC., ET AL. (No. 4401)[1]

[1] C. A. D. 218.

United States Court of Customs and Patent Appeals, November 2, 1942

*Paul P. Rao,* Assistant Attorney General (*Joseph F. Donohue* and *Richard E FitzGibbon,* special attorneys, of counsel), for the United States.

*Brooks & Brooks* (*Frederick W. Brooks,* of counsel), for appellee.

[Oral argument October 8, 1942, by Mr. Donohue and Mr. Frederick W. Brooks]

- Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Second Division.

Merchandise, consisting of hats composed of manila hemp, was assessed for duty by the collector at the port of New York as hats, bleached, at 25 cents per dozen and 25 per centum ad valorem under paragraph 1504 (b) (2) of the Tariff Act of 1930. The importers—appellees—protested, claiming that the hats were not bleached and were, therefore, dutiable under paragraph 1504 (b) (1) of that act at only 25 per centum ad valorem.

The provisions in question read:

PAR. 1504. * * * (b) Hats, bonnets, and hoods, composed wholly or in chief value of straw, chip, paper, grass, palm leaf, willow, osier, rattan, real horsehair, cuba bark, ramie, or manila hemp, whether wholly or partly manufactured:

(1) Not blocked or trimmed, and not bleached, dyed, colored, or stained, 25 per centum ad valorem;

(2) not blocked or trimmed, if bleached, dyed, colored, or stained, 25 cents per dozen and 25 per centum ad valorem; * * *

It appears from the testimony introduced by appellees that the involved hats, of which Exhibits 1, 2, and 3 are representative and which were imported into the United States from China, were woven by Chinese peasants in their homes; that because of the filthy condition of the hats, it was necessary that they be washed prior to exportation; that the washing operation consisted in placing the hats in tubs containing boiling water and granulated or powdered soap where they remained for approximately 10 or 12 hours; that after the hats were washed, they were dried or partially dried, either in the house or in the sun, starched, and ironed, and, in that condition, were imported into the United States. It further appears that the involved or like hats must be bleached or dyed or both before they are fit for their ultimate use; that there are degrees of bleaching to which the hats may be subjected; that if they are to be dyed a dark color, such as navy blue, they are not subjected to the bleaching process; that if they are to be dyed a lighter color, they must

be subjected to the bleaching process, but not to the same degree as those which are bleached white; that if the natural manila hemp color is desired, the hats must be bleached white, or substantially so, and then dyed or "toned back," the bleaching being necessary to remove discolorations which give the hats a mottled appearance; that hats like those here involved are sold in the trade as "natural sisals"; that they are not known or sold in the trade as "bleached hats" and would not be accepted as a good delivery on an order for bleached hats.

It further appears from the testimony introduced by appellees that the processes to which the involved hats were subjected prior to importation did not eliminate any of the steps in the bleaching process, nor did they contribute in any way, except to remove the filth, to the bleaching of the hats in the United States.

Appellees' witness Francis Patrick Brennan, employed by the United States Testing Co., Inc. of Hoboken, N. J., testified that his company was engaged in the business of testing all types of textiles and other materials; that he was in "charge of all textile chemical work that comes into the plant"; that he subjected a piece of material cut from Exhibit 2, from which the starch had *not* been removed, to the so-called "methylene blue test" for the purpose of determining whether the material had been bleached. The witness stated that the test consisted in placing the material in a methylene blue solution for a period of 5 minutes, then removing and rinsing it. The material thus tested, which was introduced in evidence as appellees' Illustrative Exhibit E, is of a light bluish-green color. The witness explained that the chemicals used in the bleaching process alter the structure of the fibers; that bleached fibers, when subjected to the methylene blue test, turn a "deep blue," whereas unbleached fibers "will be only faintly stained." The witness further testified that he *bleached* a piece of material cut from Exhibit 2, from which the starch had not been removed, and subjected it to the methylene blue test. The *bleached* material so tested was introduced in evidence as appellees' Illustrative Exhibit F. It is of a deep blue color. The witness further testified that, for reasons not of importance here, he did not remove the starch from the material cut from Exhibit 2 before subjecting such material to the methylene blue test. He stated, however, that while the presence of the starch would retard, it would not prevent, the methylene blue solution penetrating the fibers.

Counsel for the Government introduced in evidence the testimony of three witnesses: Lewis B. McSorley, chief chemist in the "Customs Laboratory" in New York; George H. Davis, a chemist in the United States Customs Laboratory in New York; and Paul Van Amaringe Comey, president of the R. H. Comey Co.; which company is engaged in the dyeing and bleaching of "straw braids, hemps, etc."

The witness McSorley testified that he had not subjected any of the involved merchandise to the methylene blue test for the purpose of determining whether or not it had been bleached. The witness stated that in carrying out the methylene blue test to determine whether hats like those here involved had been subjected to the bleaching process, it was *his practice* to first wash the starch out of the material; that the presence of starch "prevents the full action of the methylene blue" on the fibers, that is to say, that starched fibers will not absorb as much of the dye as unstarched fibers; that unbleached manila hemp fibers, when subjected to the methylene blue test, take on a "greenish cast, a greenish-blue color, leaning towards green, light green"; that when fully bleached fibers have been subjected to the methylene blue test they take on a "rather purplish blue," whereas if they have been only partially bleached they take on an "intermediate color, between the purplish color and the green of unbleached fiber." The witness further testified that from a visual comparison of Exhibits 1, 2, and 3, and Illustrative Exhibit H (Illustrative Exhibit H being unbleached manila hemp fibers, which the witness stated were the lightest in color he had ever seen) he concluded that Exhibits 1, 2, and 3 were lighter in color than Illustrative Exhibit H. The witness also testified that there are a number of soaps or soap powders described in certain literature which have as their constituent components bleaching materials such as peroxide or perborates.

The witness Davis stated that he had subjected fibers "teaseled" from a piece of material cut from Exhibit 2 (one of the involved hats) to the methylene blue test, hereinbefore described, *after first removing the starch.* The fibers so tested were introduced in evidence as a part of Illustrative Exhibit J and are identified on the exhibit by the letter "B." The witness also subjected fibers taken from appellees' Illustrative Exhibit A–1 (such exhibit being natural manila hemp fibers) to the methylene blue test. The fibers so tested were introduced in evidence as a part of Illustrative Exhibit J and are identified on the exhibit by the letter "A." With reference to the tested fibers, the witness stated that as those "teaseled" from appellees' Exhibit 2 were "more of an intense greenish-blue" than those taken from appellees' Illustrative Exhibit A–1, which are "a light greenish-blue tint, color," he concluded that the fibers taken from appellees' Exhibit 2 had been "subjected to the bleaching action of bleaching chemicals." The witness did not state to what degree he thought the fibers had been bleached.

It will be observed that in performing the methylene blue tests on the material cut from appellees' Exhibit 2, appellant's witness Davis removed the starch from the material which he tested before treating such material with the methylene blue solution, whereas appellees' witness Brennan did not do so.

Appellant's witness Comey testified that the *bleaching process* either removes or changes the original pigments in the manila hemp fibers; that the purpose of the bleaching process is to whiten the fibers; that the result of such process is visual; and that in his business of dyeing and bleaching materials he has used soaps, *but only experimentally*, containing bleaching chemicals.

There is other evidence of record, but we do not deem it of sufficient importance to set it out here.

On the record presented, the trial court, after reviewing the evidence in somewhat greater detail than we have deemed necessary, stated in its decision that, although there was no direct testimony that the soaps used in China to remove the filth from the hats did not contain bleaching agents, any presumption from the collector's classification that they did was "overcome and destroyed by the testimony of the defendant's witness [Comey] when he stated that during his 21 years in the bleaching and dyeing business he had used soap only *experimentally* for that purpose" [italics quoted]; and that "Evidently the experiments he had conducted did not prove successful in bleaching hats, otherwise the witness would have so stated, and thereby made his testimony of some value to the defendant [appellant]." The court found from the evidence of record that the washing process to which the hats had been subjected in China did not eliminate any of the steps in the bleaching process to which it was necessary to subject the hats in the United States, and, accordingly, held that the hats had not been "bleached" within the meaning of that term as used in paragraph 1504 (b) (2). In support of such holding, the court cited and quoted from our decision in the case of *United States* v. *Arnhold & Co., Inc., et al.*, 27 C. C. P. A. (Customs) 135, C. A. D. 74. After quoting from the decision of the Supreme Court in the case of *200 Chests of Tea*, 9 Wheat. 428, and from our decision in *Meyer & Lange et al.* v. *United States*, 6 Ct. Cust. Appls. 181, T. D. 35436, the trial court also held that "Bleached hats, *· * * in the sense of all our revenue laws, means that article which, in the known usage of trade, has acquired that distinctive appellation," and stated that "The true inquiry, therefore, is, whether in a commercial sense, the hats in question are known, and bought, and sold and used under the denomination of bleached hats." The court then concluded that as the involved hats are not known, bought, sold, or used in the trade as "bleached hats," they were not dutiable under paragraph 1504 (b) (2) as hats composed in chief value of manila hemp, "if bleached."

It is contended here by counsel for the Government that the testimony of the Government's witnesses, McSorley and Davis, clearly establishes that the involved hats have been bleached, at least to some degree; that, therefore, they are "bleached" within the meaning of

that term as used in paragraph 1504 (b) (2); that the trial court erred in holding that they were not bleached within the meaning of the provisions in question; that there is no evidence of record that the term "bleached" has a commercial meaning different from its common meaning, and that, therefore, the court erred in holding that appellees had established commercial designation.

At the time of the oral arguments in this court, counsel for appellees argued that the court below was right in holding, on the evidence of record, that the hats were not "bleached" within the meaning of that term as used in the provisions in question. Counsel conceded, however, that the evidence was not sufficient to establish commercial designation.

We are in agreement with the conclusion reached by the trial court, so far as it held that the involved hats are not "bleached" within the meaning of that term as used in paragraph 1504 (b) (2). We think it has been clearly established by the evidence of record that, although there are degrees of bleaching, the washing process to which the involved hats were subjected in China, whether or not the soap used contained bleaching chemicals, did not eliminate any of the steps of the bleaching process, and did not contribute in any way, except to remove a considerable portion of the filth from the hats, to any required degree of bleaching of the hats in the United States. We think it is clear that the term "bleached," contained in paragraph 1504 (b) (2), was not intended to cover articles such as those at bar. See *Donat & Co.* v. *United States*, 9 Ct. Cust. Appls. 162, T. D. 37997, and *United States* v. *Arnhold & Co., Inc., et al., supra.* We do not wish to be understood as holding, however, that hats which have been advanced in condition for their intended use by a bleaching process were not intended by the Congress to be included within paragraph 1504 (b) (2).

In the case of *Absorbo Beer Pad Co., Inc.* v. *United States*, 30 C. C. P. A. (Customs) 24, C. A. D. 209, this court made the following observation, which, we think, has particular application to the issues here presented:

It is well settled that higher rates of duty are ordinarily imposed on goods which have been highly processed than upon plain goods or goods on which no great manufacturing effort has been expended. *United States* v. *O. M. Baxter (Inc.)*, 16 Ct. Cust. Appls. 257, T. D. 42868. The reason for this rule, of course, is obvious. The advanced processes of manufacture of a given article require much labor, ofttimes much hand labor. Congress usually evidences a desire to encourage such manufacturing processes and labor to be applied in this country, for reasons which need no further explanation here.

It will be observed that paragraph 1504 (b) (2) provides for hats composed of manila hemp, "if bleached." It does not provide for "bleached hats."

It is true, as stated by the trial court, that, unless it clearly appears to the contrary, tariff acts are to be construed according to the commercial understanding of the terms employed therein. It is equally true that it will be presumed that the common and commercial meaning of such terms are the same, and that in order to prove commercial designation it must be established that a tariff term has a meaning in the trade and commerce of the United States different from its common meaning and that such commercial meaning is definite, uniform, and general throughout the United States. Such principles have been so well established that the citation of authorities in support of them is unnecessary. Accordingly, in order to establish commercial designation, it was incumbent upon appellees to prove that the statutory term "bleached," not the term "bleached hats," had a meaning in the trade and commerce of the United States different from its common meaning; that such commercial meaning was definite, uniform, and general throughout the United States; and that the involved hats had not been "bleached" within the commercial, as distinguished from the common, meaning of that term. That there is no such evidence, is conceded in this court by counsel for appellees. Accordingly, we must disagree with that portion of the decision of the trial court in which it was held, in substance, that commercial designation had been established.

For the reasons hereinbefore stated, the judgment is *affirmed*.