**BAR ZEL EXPEDITERS, INC., a/c Ben Clements & Sons, Inc., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 74–6–01542.**

United States Court of International Trade.

April 16, 1982.

Rivkin, Sherman & Levy, New York City (Joseph S. Kaplan and Dorothy Park Watson, New York City, at the trial; Joseph S. Kaplan and Charles H. Bayar, New York City, on the briefs), for plaintiff. Kaplan & Pellegrini, New York City, were substituted as attorney of record on June 15, 1981.

J. Paul McGrath, Asst. Atty. Gen., Washington, D. C., Joseph I. Liebman, Attorney in Charge, International Commercial Litigation Branch, New York City (Susan Handler-Menahem, New York City, at the trial and on the brief), for defendant.

RE, Chief Judge:

The question presented pertains to the proper classification, for customs duty purposes, of certain imported merchandise invoiced on shipment from Italy as "Tach-It Barbs," and from Japan as "Tach-It Nylon Tag Pins." The parties agree that the merchandise consists of plastic fasteners. The fasteners are produced in clips suitable for use in a mechanical attaching device referred to as a "gun." They have a single filament shaft with a flat paddle shape at one end, and a cylindrical retainer perpendicular to the filament shaft at the other end.

The merchandise was classified by the Customs Service under the superior heading for "clasps" as "sew-on fasteners" under item 745.63 of the Tariff Schedules of the United States, as modified by T.D. 68–9, and assessed with duty at 27.5% ad valorem. Plaintiff contests that classification with its consequential rate of duty and contends that the merchandise should properly be classified as other plastic articles not specially provided for under item 774.60, TSUS, as modified by T.D. 68–9, with the rate of duty of 8.5% ad valorem.

The defendant maintains that the customs classification is not only presumed to be correct, but that it has established that it is correct, and should be sustained. Alternatively, defendant maintains that if the customs classification is not sustained, the merchandise is dutiable under item 745.65, TSUS, as modified by T.D. 68–9, as "clasps"

other than the articles provided for in item 745.63, TSUS, with duty at the rate of 13.5% ad valorem.

Plaintiff contends in the alternative that, if the court concludes that the merchandise is to be classified as clasps, defendant's alternative claim under item 745.65, TSUS, is the proper classification.

The pertinent provisions of Schedule 7, TSUS, read as follows:

"SCHEDULE 7 – SPECIFIED PRODUCTS; MISCELLANEOUS AND NONENUMERATED PRODUCTS

\* \* \* \* \* \* \*

PART 7. – BUTTONS, BUCKLES, PINS, AND OTHER FASTENING DEVICES; \* \* \*

Subpart A. – Buttons, Buckles, Pins, Hooks and Eyes, and Slide Fasteners

\* \* \* \* \* \* \*

Clasps, handbag and similar frames incorporating clasps, and snap fasteners; all the foregoing and parts thereof: Valued not over 20 cents per dozen pieces or parts:

[Classified by the Customs Service]

745.63      Sew-on fasteners, and parts thereof . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27.5% ad val.

[Claimed in the alternative by plaintiff and defendant]

745.65      Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13.5% ad val.

\* \* \* \* \* \* \*

[Plaintiff's principal claim]

PART 12. – RUBBER AND PLASTICS PRODUCTS

\* \* \* \* \* \* \*

Subpart D. – Articles Not Specially Provided For, of Rubber or Plastics

Articles not specially provided for, of rubber or plastics:

\* \* \* \* \* \* \*

744.60      Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8.5% ad val."

---

The parties have agreed in a pre-trial statement that the merchandise is "identical in all material respects" to that which was the subject of *Kimball Systems, Inc. v. United States*, 80 Cust.Ct. 54, C.D. 4738 (1978). It was also agreed that—

"[f]or application, a clip of Tach-Its is inserted into a fastening device, or 'gun' which is equipped with a hollow slotted or grooved needle. The needle is inserted into or through the articles and the plastic fastener is propelled the length of the needle, thereby penetrating the articles. The needle is then withdrawn, and the plastic fastener remains inserted through the articles. Tach-Its and similar plastic fasteners have protrusions at either end which prevent them from falling out after insertion."

The record in *Kimball*, as well as the present record, has established that the fastening procedure is used in lieu of hand or machine sewing to fasten labels into garments, and to pair and fasten two or more articles, such as shoes. It has also been established that when the merchandise was first marketed by plaintiff, one of its intended uses was to replace string tags and the sewing needle procedures by which string tags were previously attached.

In *Kimball*, the imported plastic fasteners were also classified under the superior

heading for "clasps" as "sew-on fasteners" under item 745.63, and plaintiff's claim was also for classification under item 774.60 as other plastic articles not specially provided for. The defendant alternatively sought classification under item 745.65 as "clasps" other than the articles provided for in item 745.63. The court held that the plaintiff failed to overcome the presumption of correctness which attached to the classification of the merchandise as "sew-on fasteners," and that the merchandise fell within the common meaning of the term "clasp" which the court described as an item that fastens or joins two things or parts of things. Hence, the customs classification of the merchandise was sustained.

It is well to review the reason for the court's holding in *Kimball*. Although the merchandise therein was classified as "sew-on fasteners," the primary issue before the court was whether, as claimed by the plaintiff "releasability" was required for the imported merchandise to be classified as "clasps." The presumption of correctness that attached to the classification as "sew-on fasteners" included a presumption of correctness that the importations were "clasps" in the first instance. Because of the "limited experience and expertise" of plaintiff's only witness, the court relied primarily on the lexicographic definitions of "clasp," and held that since releasability was not required under those definitions, plaintiff failed to overcome the presumption of correctness that the merchandise was "sew-on fasteners," as classified. In *Kimball* the court stated, "Even if it were to be assumed * * * that the lexicographic authorities were inconclusive, plaintiff has not submitted convincing expert testimony to overcome the presumption of correctness that attaches to the classification of the customs officials and the supporting evidence introduced by the defendant." 80 Cust.Ct. at 60.

The plaintiff in the present action has produced numerous witnesses and exhibits in support of its claim that the court in *Kimball* was in error with respect to the common meaning for "clasps." Plaintiff also contends that, even if the common

meaning for "clasps" was correctly stated in *Kimball*, "the commercial meaning of 'clasps' is different and narrower since [the imported] tag fasteners are not known as 'clasps' in trade and commerce."

The question before this court, however, is not whether the imported plastic fasteners are known as "clasps" in trade or commerce, but whether plaintiff has established a commercial meaning for "clasps" different from the common meaning stated in *Kimball*. If plaintiff has not established a commercial designation for "clasps" or "sew-on fasteners" which would exclude the imported plastic fasteners, the second question before the court is whether the holding of the *Kimball* decision should be followed under the doctrine of *stare decisis*.

The court has concluded that plaintiff has not established a commercial designation for "clasps" or "sew-on fasteners" which excludes the imported plastic fasteners. The court has also concluded that plaintiff has not made a clear and convincing showing that the holding of *Kimball* was erroneous. Since it is the determination of the court that plaintiff has not proven that the imported plastic fasteners were incorrectly classified, the classification is sustained.

### Commercial Designation

It is well established that if the words used in tariff acts to designate particular kinds or classes of merchandise have a widely known meaning in trade and commerce different from their common meaning, the commercial meaning prevails unless Congress clearly manifested a contrary intent. *Cadwalader v. Zeh*, 151 U.S. 171, 14 S.Ct. 288, 38 L.Ed. 115 (1894); *Nylos Trading Co. v. United States*, 37 C.C.P.A. 71, C.A.D. 422 (1949); *I. Shalom & Co. v. United States*, 22 C.C.P.A. 85, 87, T.D. 47067 (1934).

Proof of commercial designation of imported merchandise is a question of fact to be established in each case. *Daniel Green Shoe Co. v. United States*, 58 Cust.Ct. 7, C.D. 2868 (1967). It is also presumed that the common meaning and commercial

meaning of terms employed in the tariff acts are the same. In order to prove commercial designation, it must be proved that a tariff term has a meaning in the trade and commerce of the United States different from its common meaning, and that the commercial meaning is definite, uniform and general throughout the United States. *Green, supra; United States v. Armand Schwab & Co.,* 30 C.C.P.A. 72, C.A.D. 218 (1942). Plaintiff contends that the commercial meaning of the terms "clasps" and "sew-on fasteners" differs from their common meaning. There is no question that the plaintiff must bear the burden of proof on this issue. *Heads and Threads, Division of MSL Industries, Inc. v. United States,* 60 Cust.Ct. 308, C.D. 3374, 282 F.Supp. 484 (1968); *Fung Chong Co. v. United States,* 15 Cust.Ct. 37, C.D. 937 (1945), *aff'd,* 34 C.C.P.A. 40, C.A.D. 342 (1946).

The thrust of plaintiff's efforts, however, has been to prove that the imported fasteners are not known in trade and commerce as "clasps" or "sew-on fasteners." In *Heads and Threads* it was stated that "[t]his rule of commercial designation 'was intended to apply to cases where the trade designation is so universal and well understood that the Congress, and all the trade, are supposed to have been fully acquainted with the practice at the time the law was enacted.' [Citations omitted.]" 60 Cust.Ct. at 313. Judge Maletz, writing for the court, stated:

"[W]here a party seeks to establish that merchandise is not included within the commercial meaning of a tariff term, it is requisite that his proof show first, that the term had a commercial meaning in the trade differing from its common meaning; second, what that common meaning was; and third, that that meaning did not include the merchandise in controversy. * * * *It is not sufficient to show that* at or prior to enactment of the tariff law, *the merchandise was always known by a name other than the tariff term.*" (Emphasis added.) 60 Cust.Ct. at 314.

The principle is illustrated in the *Fung Chong* case, wherein kumquat oranges were classified as prepared or preserved fruit. Plaintiff challenged the classification, and contended that they were within the common meaning of the term "oranges" and should have been classified as "oranges." The defendant admitted that the common meaning of "oranges" included kumquats, but introduced testimony to the effect that the commercial meaning of "oranges" did not include kumquats. The Customs Court held that defendant's evidence had not established a commercial meaning for the term "oranges," and sustained plaintiff's protest.

On appeal, the Court of Customs and Patent Appeals affirmed the Customs Court in holding that the government had not borne the burden of establishing a commercial designation, and stated:

"In the absence of any testimony as to the commercial meaning of the term 'orange,' the statement of the witnesses that the involved merchandise was excluded from that term is insufficient to prove commercial designation. [Citations omitted.]" 34 C.C.P.A. at 44.

Both *Heads and Threads* and *Fung Chong* teach that in establishing a commercial designation of merchandise, it is not sufficient merely to show that the merchandise does not fall within an undefined commercial meaning different from the common meaning. It is necessary that claimant establish what *is* the commercial designation for that merchandise.

In the case at bar, plaintiff is in a position similar to that of the defendant in *Fung Chong.* Although the plaintiff has introduced witnesses who have stated that the merchandise is not known as "clasps" or "sew-on fasteners" in trade and commerce, it has not introduced testimony which the court deems sufficient, credible and reliable to establish a commercial designation for "clasps" or "sew-on fasteners." The fact that, in the opinion of plaintiff's witnesses, the plastic fasteners are not known in the trade as "clasps" or "sew-on fasteners" is not proof of commercial designation. Not only is much of that testimony contradictory and inconclusive on the question of com-

mercial designation, but it also fails to establish a commercial designation for "clasps" or "sew-on fasteners" that is definite and uniform throughout the United States. In view of the totally inconclusive evidence on the question of commercial designation, plaintiff has not borne its burden of proving that the imported fasteners fall within a commercial designation different from the common meaning of "clasps" or "sew-on fasteners."

## Stare Decisis

Since the plaintiff has not discharged its burden on the issue of commercial designation, the court must address the question whether the holding in *Kimball*, as contended by the defendant, is *stare decisis* of the present action. Plaintiff claims the holding is clearly erroneous, and therefore should not govern the disposition of this case.

On the applicability of the doctrine of *stare decisis*, in *United States v. Dodge & Olcott, Inc.*, 47 C.C.P.A. 100, 103, C.A.D. 737 (1960), the Court of Customs and Patent Appeals has stated:

"While we always are open to consider all proper and pertinent matters which bear upon the issue of possible error in an earlier decision, such matters when presented must be *clear and convincing*. It is unfair both to the courts and to the parties litigant that there be a re-adjudication of issues previously determined except upon a *clear and convincing showing of error*. This requirement is not satisfied by a reargument of the former issues on the same or a merely cumulative record." (Emphasis added.)

The court, of course, will consider all matters carefully, and will not apply precedent blindly.

In *Kimball*, the merchandise was identical to the imported merchandise in this case, and, except for the issue of commercial meaning, plaintiff's and defendant's contentions were also identical to those in the present case. The court, nevertheless, will consider whether the holding in *Kimball* is erroneous, and reexamine the questions considered in *Kimball* in light of the expanded record of the present case.

The questions considered in *Kimball* were whether the fasteners fell within the common meaning of the term "clasps," and whether they had been properly classified as "sew-on fasteners" under item 745.63. Plaintiff argued in *Kimball* that the fasteners did not come within the common meaning of "clasps" because they were not releasable, and were not generally bought, sold or referred to as "clasps." The court, after consulting various lexicographic authorities, concluded that releasability was not required, and stated:

"Thus, despite plaintiff's arguments to the contrary, the clear lexicographic authorities indicate that releasability is not required for an article to be considered a clasp. According to most dictionaries, the only requirement is that the item fasten or join two parts or things." 80 Cust.Ct. at 60.

Even if the lexicographic authorities had been considered inconclusive by the court, the expert testimony offered by plaintiff was determined to be insufficient to overcome the statutory presumption of correctness.

In the present action, in contending that *Kimball* is not controlling and should not be followed, plaintiff maintains that the court in *Kimball* focused attention solely on the releasability aspect of the common meaning of the term "clasps," and not on other important aspects of the definition of the term. According to the plaintiff, under better lexicographic authority, the fasteners before the court are not "clasps." Secondly, plaintiff refers to the testimony of defendant's witness, Professor Kahn, who testified both in *Kimball* and in the present case, that the fasteners were "sew-on fasteners." Plaintiff submits that Professor Kahn's testimony was based on the fact that the plastic fasteners were affixed to material by a sewing process, whereas plaintiff claims that the sewing process requires a needle and thread. Plaintiff urges that the part of the gun used for attaching the fasteners is not a needle and that the fasteners are not thread. Thus, it main-

tains that the process of affixing the fasteners is not sewing, and since the fasteners are not sewn on, they are not "sew-on fasteners."

The court in *Kimball* did not define "sewing," nor determine the common meaning of the term "sew-on fasteners." Rather, it held that plaintiff's evidence was not sufficient to support a conclusion that the plastic fasteners were not "sew-on fasteners." In addition to reexamining its holding as to the common meaning for "clasps," the court, therefore, in the present case, may determine whether the plastic fasteners are "sew-on fasteners," as classified.

### The Clasp Issue

On the "clasp" issue, in two earlier cases decided before *Kimball*, the Court of Customs and Patent Appeals considered whether certain merchandise fell within the ambit of "clasps," as used in paragraph 348 of the Tariff Act of 1922. See *United States v. Murphy & Co.*, 13 Ct.Cust.Appls. 456, 461, T.D. 41348 (1926); *United States v. Clarke & Co.*, 13 Ct.Cust.Appls. 462, 465, T.D. 41349 (1926). Paragraph 348 provided for:

> "Snap fasteners and clasps, and parts thereof, by whatever name known, or of whatever material composed, not plated with gold, silver, or platinum and not mounted on tape * * * 55 per centum ad valorem; mounted on tape, including sew-on fasteners, * * * 60 per centum ad valorem."

In both cases the appellate court adopted the definition of the term "clasp" as defined in *Funk & Wagnalls New Standard Dictionary*:

> "1. A fastening by which things or the parts of a thing are bound or held together; also, any instrument or bond of connection, as a tendril, the hook that fastens on an eye, a grappling-iron, etc." *Id.*

Although this definition was also considered by the court in *Kimball*, which held the plastic fasteners to be "clasps," plaintiff, nevertheless, seeks to distinguish the impact of the *Murphy* and *Clarke* decisions by urging that the merchandise in those cases was determined to be "clasps" because it fell within the definition of "fastening," as described by *Funk & Wagnalls*.

The importations in *Murphy* were circular brass spring snaps or clasps used for the purpose of connecting and fastening the ends of necklaces, and those of *Clarke* were dress buckles or dress clasps designed to be worn on apparel or carried on or about or attached to the person. Plaintiff contends that the appellate court in *Murphy* "expressly disavowed the notion that all fasteners are clasps." Finally, plaintiff maintains that *Murphy* and *Clarke* did not deal with the common meaning of the term "clasps," but rather with limitations on and exceptions to the term "clasps." Hence, it submits that these decisions cannot be considered authoritative judicial pronouncements on the common meaning of the term "clasps."

In considering whether the spring snaps or clasps in *Murphy* were dutiable under paragraph 348, or paragraph 1428, which provided for metal jewelry material, the court stated:

> "It having been established in this case that the articles in question are fasteners, and that they are known both as clasps and as snap fasteners, and apparently being within the dictionary definitions of such articles, and as they are not plated with gold, silver, or platinum, they are *eo nomine* provided for in paragraph 348, *supra*, as snap fasteners or clasps; and, as the *eo nomine* provision for snap fasteners and clasps is a more specific designation of such articles than the general provision for materials of metal suitable for use in the manufacture of jewelry contained in paragraph 1428, *supra*, they must be held to be properly dutiable under paragraph 348, *supra*. [Citations omitted.]" 13 Ct.Cust.Appls. at 461–462.

Accordingly, plaintiff's contention, that the court considered the merchandise before it as "clasps" merely because it fell within the dictionary definition of "fastenings," is not correct, since the court also found that the merchandise fell within the dictionary meaning of "clasps."

It may be well to note the following comment of the court in *Clarke* on paragraph 348:

> "Paragraph 348, *supra*, provides for clasps, by whatever name known, which would include clasps, even if they were known as buckles. These articles [dress buckles-dress clasps] are clasps. They come within the dictionary definition of such articles, and are known as such, as well as buckles." 13 Ct.Cust.Appls. at 465.

The *Clarke* case, therefore, supports the conclusion that the merchandise was considered to be "clasps" since it fell within the *Funk & Wagnalls'* definition of that term.

As to plaintiff's contention that the *Murphy* court disavowed the notion that all fasteners are clasps, defendant has correctly pointed out that the court in *Murphy* "does not state that not all fasteners are clasps," but "rather * * * that not all fasteners are included within paragraph 348." Plaintiff's argument that *Murphy* and *Clarke* are not binding judicial pronouncements on the meaning of the term "clasps" is, therefore, without merit since the court in both cases was required to determine the common meaning of the term. Plaintiff's assertion in the present action, that at no point in *Murphy* or *Clarke* was the description of the merchandise as "clasps" at issue, is incorrect since the appellate court, in both cases, was required to decide whether the merchandise fell within the provision for "clasps" in paragraph 348 of the Tariff Act of 1922.

Based on the definitions of "clasp" used by the appellate court in *Murphy, Clarke,* and this court in *Kimball,* the plaintiff states that, while the issue in *Kimball* was whether releasability was an essential characteristic of a "clasp," other material aspects of the definition of "clasp," which were not at issue in *Kimball,* are pertinent to the instant action. It is the crux of plaintiff's argument that consideration in this case of the other "material aspects" of the definition renders the *Kimball* decision erroneous.

The paramount issue presented for decision in the *Kimball* case was the common meaning of the term "clasps." 80 Cust.Ct. at 59–60. It is well established that Congress utilizes the common meaning of a word in the absence of evidence of a contrary commercial designation. *Nylos Trading Co. v. United States,* 37 C.C.P.A. 71, C.A.D. 422 (1949). Both parties in this action agree that the common meaning of a tariff term is a question of law. *Schott Optical Glass, Inc. v. United States,* 67 C.C.P.A. ——, C.A.D. 1239, 612 F.2d 1283 (1979); *Marshall Field & Co. v. United States,* 45 C.C.P.A. 72, C.A.D. 676 (1958). It is also agreed that, in determining common meaning, the court will rely upon prior decisions of the courts and the definitions found in dictionaries and other lexicographic authorities. *United States v. Mercantil Distribuidora,* 43 C.C.P.A. 111, C.A.D. 617 (1956). The Court of Customs and Patent Appeals has recently stated that "[w]hen Congress has used a term in its everyday sense, dictionary citations are most significant." *United States v. Standard Surplus Sales, Inc.,* 68 C.C.P.A. ——, 667 F.2d 1011, 1013 (slip op. at 6, Dec. 17, 1981), citing *Floral Arts Studio v. United States,* 46 C.C.P.A. 21, 26, C.A.D. 690 (1958). The court may accept other evidence, although advisory, upon the issue of common meaning.

Plaintiff's contention that *Kimball* is not controlling raises the issue whether the court's conclusion in that case, based upon its understanding of the lexicographic definition of "clasp," was error. The question, therefore, is whether *Kimball* was erroneously decided, and is contrary to reason.

In support of its contention, plaintiff objects to the *Funk & Wagnalls'* definition relied upon in *Murphy, Clarke* and *Kimball.* It states that, without taking into account cross-references and synonyms, the definition was overly broad and meaningless. Plaintiff suggests, moreover, that in considering cross-references and synonyms, the correct definition of "clasp" is actually based upon the manner in which a clasp binds or holds articles together, i.e., by itself closing firmly together.

Plaintiff contends also that the definition of "clasp" in several editions of *Webster's International Dictionary*, and the definition of the cross-referenced term of "catch" in *Webster's* oldest edition, declare the aspect of fastening to be temporary or releasable. Plaintiff also states that the definition of "clasp" contained in the *Oxford New English Dictionary on Historical Principles* (1893) supports, with illustrations, the claim that releasability and refastening are essential components in the definition of "clasp."

The court has before it several samples, and has examined them carefully, among which are plaintiff's exhibits 1–A and 1–B, illustrative samples of the imported merchandise, and plaintiff's exhibit 2, the "Tach-It" gun used to attach them. Samples of merchandise are often potent witnesses. See *United States v. May Department Stores Co.*, 16 Ct.Cust.Appls. 353, T.D. 43090 (1928); *Marshall Field & Co. v. United States*, 45 C.C.P.A. 72, C.A.D. 676 (1958). Notwithstanding the voluminous record in this case, plaintiff has not substantiated its contention that the definition in *Funk & Wagnalls* is so broad as to be meaningless. It has not demonstrated that, on examination, one would be unable to identify an article as a clasp by reference to the elements of that definition relied upon by the courts in *Murphy, Clarke* and *Kimball.* See also *Border Brokerage Co. v. United States*, 2 CIT ——, Slip Op. 81–103, 533 F.Supp. 1339 (1981).

Not only does plaintiff agree that the "Tach-It Barbs" or "Tach-It Nylon Tag Pins" are plastic *fasteners*, but several of its witnesses were also in agreement with the definition of "clasp" as stated in *Kimball.* Moreover, several of plaintiff's witnesses were unfamiliar with the terms "clasp" and "sew-on fastener," and those who were familiar with the terms were limited in their experience. From the record it is evident that much of the testimony of plaintiff's witnesses is conflicting, and does not establish a uniform meaning throughout the industry for the term "clasps." On the authority of the *Heads and Threads* and *Fung Chong* cases, the testimony of the witnesses for plaintiff,

that the plastic fasteners are known as tie lines, strings, attachments and bullets, does not establish that they are not "clasps" within the definition stated in *Kimball.* Moreover, the fact that there are many different types of clasps does not exclude the plastic fasteners at issue from also falling within the common understanding of the term. As stated by our appellate court in *Marshall Field & Co. v. United States*, 45 C.C.P.A. 72, 80, C.A.D. 676 (1958), "[T]he basic rule [is] that common understanding of the meaning of the words controls." Judge Rich, writing for the court, stated that "it is not the business of this court to rewrite the tariff act but rather to apply it in specific situations." *Id.*

Plaintiff's allegation, as to the manner in which a clasp holds materials together, is not persuasive. In support of that contention, plaintiff relies upon the *Funk & Wagnalls'* definition of the *verb* "clasp," whereas the courts in *Murphy, Clarke* and *Kimball* determined the common meaning of the *noun* "clasp." Although plaintiff has referred to definitions in various editions of *Webster's International Dictionary*, which contain the element of releasability or nonpermanency, it has not refuted the other dictionaries cited by the defendant which state that releasability is not included in the definitions of the term "clasps." For example, in *A Standard Dictionary of the English Language*, Funk & Wagnalls Co. (1910), at page 494, a "clasp" is defined as:

"1. A fastening by which things or the parts of a thing are bound or held together; also, any instrument or bond of connection, as a tendril, the hook that fastens on an eye, a grappling-iron, etc."

Thus, plaintiff has not borne its burden of proof that the conclusion in *Kimball*, that a clasp need not be releasable and must merely fasten or join two parts or things, is in error and should not control the present case.

*Sew-on Fastener Issue*

On the sew-on fastener issue, there is no dispute that the imported plastic fasteners

are used to attach or fasten materials. At issue is whether the fasteners are affixed by a procedure which would establish them as "sew-on fasteners." The question, therefore, is whether the process of affixing the fastener is a sewing operation.

Several decisions of this court have discussed the sewing process: *Dolliff & Co. v. United States*, 65 Cust.Ct. 681, 687, C.D. 4158, 319 F.Supp. 1392 (1970), aff'd, 59 C.C. P.A. 101, C.A.D. 1047, 458 F.2d 146 (1972); *Hauser & Reisfeld, Inc. v. United States*, 39 Cust.Ct. 66, C.D. 1906 (1957); *Amberg, Schwab & Co. v. United States*, 64 Treas. Dec. 433, T.D. 46701 (1933). These cases are in accord with the definition of "sewing" as found in *Webster's Third New International Dictionary of the English Language* (1966):

"1a: to unite, attach, or fasten by stitches made with a flexible thread or filament."

"Stitch" is defined as follows:

"2: a single complete in-and-out movement of a threaded needle in sewing, embroidering, or suturing * *."

In *Amberg*, the earliest case decided by this court wherein many definitions of "sewing" were examined, it was stated that—

"a fair construction of the word 'sew' would be that a needle, awl, or *other tool* must be used, and that the needle, awl, or *other tool* used must actually puncture or penetrate the fabric being sewn, as contradistinguished from lacing or looping the thread, twine, wire, *or other flexible material being used*, actually passing through each puncture or penetration made in the fabric being sewn, by the needle, awl, or *other tool* used. Of course, the fabric thus sewn must be united, joined, or attached." (Emphasis added.) 64 Treas.Dec. at 436.

In holding that certain hemp hats were not sewed hats, within the meaning of paragraph 1504 of the Tariff Act of 1930, the court stated further:

"[T]here is no indication in said paragraph 1504 that Congress intended to give to the word 'sew' a limited or narrow meaning, yet, to hold that the mere passing of a thread, twine, wire, or other flexible material between the loops on the edges of a certain fabric was 'sewing' we think would be entirely too broad a construction to place on the word 'sew.' " *Id.*

To determine what is "sewing" in a particular case, in addition to testimony of record which the court regards as credible and reliable, the court must look to prior decisions of the courts and definitions found in dictionaries. *United States v. Mercantil Distribuidora*, 43 C.C.P.A. 111, 117, C.A.D. 617 (1956).

On the question of what constitutes a sewing operation, the court has relied upon the testimony of Professor Irwin Kahn of the Fashion Institute of Technology. Professor Kahn testified that he taught at the Fashion Institute "anything and everything that relates to apparel manufacturing, production, and management." Professor Kahn is also the chairman of the Apparel Production Management Department, and has been a superintendent of operations, a plant manager, a factory engineer, as well as a consultant to his industry.

In his precise, authoritative and well-considered testimony, Professor Kahn defined sewing, as he had done previously in the *Kimball* case, as "the placing together of two materials or more and the keeping of them in place to each other by the introduction of a third substance drawn by a needle." He stated with firmness and conviction that, when the fasteners at issue are affixed to fabric, the process of attachment is "sewing," and that the fasteners are, therefore, "sew-on fasteners." According to Professor Kahn's testimony on the definition of "sewing" in the present case, it does not matter whether a substance is *drawn* or *pushed* by a needle when being worked through another substance. Since the plastic fasteners are attached by a needle which pushes them through other material, he, therefore, considered the operation to be a "sewing" process. Although Profes-

sor Kahn broadened his definition of "sewing," there is no doubt that the fastening devices at bar meet the elements of Professor Kahn's prior definition of sewing, as well as the expanded definition. The court has found the expert testimony of Professor Kahn, that the plastic fasteners are "sewn on," to be credible, reliable and persuasive.

Plaintiff contends that the mechanism which draws or pushes the fasteners through various materials is not a needle and, in support, cites *In re G. W. Sheldon & Co.*, 32 Treas.Dec. 502, T.D. 37176 (1917), for the proposition that an instrument, to be a needle, must have an eye. The opinion of the Board of General Appraisers in that case discussed the definition of needle in the context of what was understood to be a traditional sewing machine. The imported merchandise in that case was a looping machine, which punched holes in paper, inserted therein a piece of cord, and tied both things together, forming a loop by which calendars and other articles could be hung from walls. The Board sustained the classification of the imported merchandise as manufactures of metal, denying classification as sewing machines under paragraph 441 of the Tariff Act of 1913, as claimed. The Board noted that the loops made were not stitches, as that term was commonly understood, and that the merchandise consisted merely of a looping machine. Since the machine did not contain a needle, the discussion by the Board, in its opinion decided in 1917, as to the necessity for a needle to have an eye, was at best *dicta*.

In the present case, the court is not required to determine whether the "Tach-It" gun is a sewing machine, but whether the plastic fasteners, which are inserted by the "Tach-It" gun by means of a needle, are sew-on fasteners for tariff purposes.

According to the definitions in *Webster*, a stitch results from the single, complete in-and-out movement of a needle with thread or filament. It is important to note that *Webster's* definition of "sewing" makes no mention of a needle and, therefore, there is no necessity for an eye of a needle to be part of the sewing process. Moreover, the *Encyclopaedia Britannica* (15th ed.), volume VII at page 240, which defines a sewing needle, makes no mention of an eye:

"The sewing needle is small, slender, rod-like, with a sharply pointed end to facilitate passing through fabric and with the opposite end slotted to carry a thread."

It adds that—

"[t]he earliest iron needles, dating to the 14th century, had no eye but had a closed hook to carry the thread."

The opinion in the *Amberg* case, in defining "sewing," likewise does not mention that a needle with an eye ·is essential, but states that an "awl or other tool must be used * * * [to] puncture or penetrate the fabric being sewn." From all of the foregoing, it is evident that a needle is generally understood to be a pointed, slender instrument and that a needle need not contain an eye unless it is necessary for the use of the particular needle. Traditional methods of sewing have utilized needles with an eye in order for the thread or filament to be introduced into a fabric, especially in the case of the traditional sewing machine. In the expanding technology of the sewing process, however, it is apparent that other items have replaced eyes in needles, such as the "pronged slits" in the *Hauser* case, and the *grooves* of the needle in the "Tach-It" gun in the instant case, and that they have served to introduce a thread or filament into the articles united, attached or fastened.

It is also important to note that the parties, in a stipulation executed before trial, have conceded that: 1) the plastic fasteners in issue are inserted into a "fastening device, or 'gun,' which is equipped with a hollow slotted or grooved *needle*"; 2) "the *needle* is inserted into or through the articles and the plastic fastener is propelled the length of the *needle*, thereby penetrating the articles"; and 3) the "*needle* is then withdrawn, and the plastic fastener remains inserted through the articles." (Emphasis added.) Since the parties have agreed that the plastic fasteners are inserted by a needle, the fact that the needle contains no eye is not crucial in the present case. More-

over, in the plaintiff's promotional material for the "Tach-It" guns, as represented by plaintiff's collective exhibit 12, many references are made to the needles of the guns, their advantages, instructions on their use, and to the fact that they come in six styles. Other exhibits produced at the trial also expressly refer to the "needle" of the attaching devices. The plaintiff's argument, that the mechanism which draws or pushes the fasteners is not a needle, is, therefore, without merit.

Plaintiff's contention that the fasteners, which are the materials affixed by the "Tach-It" fastening device, cannot be considered thread, is also without merit. It is refuted by the existence of the single *filament* shaft of the imported merchandise, and by numerous references in other exhibits to the plastic fastener as a *"filament."* Not only is thread defined as a filament or fiber of a ductile substance, but the definition of "sew," as indicated above, includes a *filament* as one of the substances used to "unite, attach, or fasten by stitches."

The contention by plaintiff, that "sewing" must contain the elements that have in the past been traditionally associated with that function, fails to acknowledge the technological changes in the industry which have made numerous advances in the sewing process. This was established at the trial not only by testimony of defendant's witnesses, but also by that of plaintiff's witnesses. For example, defendant's witness, Mr. Gerard Merser, general manager of the fastener division of the Dennison Manufacturing Company, identified defendant's collective exhibit "G" as items that were part of an emerging technology for sewing which utilize plastic fasteners in the sewing process. Mr. Merser substantiated the testimony of Mr. Paul Kirschner, another witness for the defendant, that plastic fasteners replaced "hand finishers doing hand sewing."

Mr. Merser was in charge of new products development at Dennison and was co-inventor of the Swiftach System, supervising all phases of development, testing, sales and marketing. The Swiftach System comprises a gun which is a scissors-activated type of attaching device as distinguished from the pistol-grip version of the "Tach-It" gun. Mr. Merser testified, however, that the action contained within the operating means is basically similar, and that though there are differences in design between the fasteners of both guns, in essence they function in the same way. He referred to the fastener of the Swiftach System as a plastic filament and stated that the use of the Dennison gun and plastic fasteners could be considered a sewing operation. Mr. Merser concluded, "The reason I call it a sewing operation is that the fastener itself is applied using a sewing function, utilizing a needle; it utilizes filament; it utilizes, if I may call them for a moment, knots at the end of the filament, which means are used to secure the stitch, if you will. So, the Swiftachment sewing fastener is a sewing operation." At another point in his testimony, he described the filament as "the elongated part of the fastener."

Mr. Merser also described how a needle functions in a traditional sewing machine, and testified that it was comparable to the operation of a plastic fastener "[b]ecause the plastic fastener is sewn into the material by pushing the needle through the material. The needle contains the thread and the end is also the securing means or the knot. It is an advancement of the art, in a sense." The court has placed great weight on the testimony of Mr. Merser, an acknowledged expert in the industry based on his long and extensive experience in marketing and manufacturing activities of the Dennison "Swiftach" machine and fasteners. Mr. Merser was without hesitation in his testimony that the imported fasteners were sew-on fasteners.

Mr. Allen Clements, who was responsible for the purchase of the merchandise on the invoices in this case, in testifying for the plaintiff, acknowledged an advertisement of his firm which advertised the imported merchandise as follows: "If you can sew it with a sewing needle, you can tag it with a "Tach-It." Against the background of a

demonstration by Mr. Merser during the trial, in which he sewed a seam inside a jacket with a three-inch fastener, this statement in the advertisement by Mr. Clement's firm, as evidenced by exhibit 12, is no exaggeration. It is clear from the demonstration that the fastener was attached by a sewing operation which included a needle and a filament.

Although the use of the plastic fastener is a more efficient, economical and speedier method of attaching or fastening tags than previous methods, the record is replete with examples of many other uses. Thus, the plastic fasteners are used to hold the facing to the front of a coat; to attach a scarf or hat to the back of a coat; to hold a pleat of a garment together; to form loops for belts; to sew the fabric onto the frame of an umbrella; to close open wounds or openings in cadavers during autopsies; to sew buttons onto garments; to join and to pair articles; to hold pleats in curtains and draperies during the cleaning process; to sew skirts on hangers to prevent their slippage; and to sew the mesh and other components together before being installed in catalytic converters of automobiles. With respect to their use in tagging and pairing merchandise, Mr. Merser testified that, in the industry, the persons responsible for sewing the tags to merchandise are called "tag *sewers*."

In the toy industry, in addition to attaching tags in the process of packaging, the plastic fasteners are used to attach clothing to stuffed toys and to create faces on the toys. In the animal world, veterinarians use the plastic fasteners for suturing, and in the fish industry they are used for biological studies. In the air conditioning and air purification industry, the fasteners are sewn into filter bags to prevent the bags from opening. It is clear, therefore, that in addition to their use as tag fasteners, the imported merchandise functions as fasteners of many items, and for many purposes.

In addition to defendant's collective exhibit "G," defendant's collective exhibit "S," which contains promotional and instructional material for products of Dennison Manufacturing Company, also illustrates the changes taking place in the process of sewing. Many references are made in both exhibits to plastic fasteners as having replaced the original method of sewing. For example, the instructional matter of exhibit "G–A," which consists of plastic filaments that are inserted through buttons and fabric, and then locked in place, states: "For the fashions you *sew* and the buttons you replace * * * now you'll never have to *sew* on a replacement or an original button again." Defendant's exhibit "S–D," advertising material for the Swiftach Systems described by Mr. Merser, speaks of saving "up to 50% of the attaching time now expended in old fashioned 'string and clip' tagging, *sewing* or *clasping* operations." (Emphasis added.)

Another example of new methods in the sewing process is an instant button attacher called "Buttoneer Plus," represented by defendant's exhibit "K," in which it is stated that "[b]uttoneer fasteners are made of tough synthetic filament" and that *sewing* is among their several uses. It also describes how the Buttoneer can accomplish a hidden *stitch* on garments with double layers of fabric. In describing exhibit "G–A," Mr. Merser testified that, in sewing a button to a garment by the use of the plastic filaments, it is not necessary that a traditional stitch be performed in the sense of having to use a needle and thread, nor that a traditional knot secure the button. The instructional material for exhibit "G–A" also describes how to "thread filament."

The plastic fasteners were classified under the *eo nomine* designation of "sew-on fasteners." Although the meaning of that term is determined as of the time of enactment of the tariff act, it nevertheless embraces "articles subsequently created which come within its scope." *Sears Roebuck and Co. v. United States*, 46 C.C.P.A. 79, 82, C.A.D. 701 (1959). As stated by Chief Judge Markey in *United States v. Standard Surplus Sales, Inc., supra*:

"Tariff terms are written for the future as well as the present, *United States v. L. A. Salomon & Bro.*, 22 C.C.P.A. 490,

495, T.D. 47483 (1935), meaning that tariff terms can be expected to encompass merchandise not known to commerce at the time of their enactment, provided the new article possesses an essential resemblance to the one named in the statute. *Smillie & Co. v. United States*, 12 Ct. Cust.Appls. 365, 367, T.D. 40520 (1924)." 68 C.C.P.A. at ——, 667 F.2d 1011, 1014 (slip op. at 7).

Plaintiff argues that the issue is whether the process of attaching the "Tach-It" fasteners is sewing, and not whether the "Tach-It" fastening device is a sewing machine. However, plaintiff has not presented any evidence that the court considers credible and persuasive upon which it could find that the process of attaching the fasteners is not sewing or a sewing operation. Although much of plaintiff's testimony emphasizes that sewing is a skilled craft, it is not necessary that all forms of sewing demand the same skill, and nowhere does the definition of sewing require that it be done by hand, or by any specific type of mechanical device.

In the present case, as in *Kimball*, the defendant has not merely relied upon the presumption of correctness that attaches to the classification of the customs officials, but has come forward with credible, reliable and persuasive evidence in support of that classification. The court finds the witnesses for the defendant to be credible and reliable. On the other hand, the court finds the testimony of plaintiff's witnesses to be contradictory, largely repetitive and cumulative of the testimony in the prior *Kimball* case. From the foregoing, the court is therefore not convinced that it was error for customs officials to classify the imported plastic fasteners as "sew-on fasteners" under item 745.63.

In view of the vigorous efforts of counsel in this case, it is well to place the question presented in proper perspective. What is at issue is the classification, for customs duty purposes, of certain plastic fasteners. That they are plastic fasteners, and that they are the same as those that were at issue in the *Kimball* case, has been admitted. Their classification as "sew-on fasteners" under item 745.63, TSUS, by statute, is presumed to be correct, and the burden to prove otherwise is placed upon the plaintiff. 28 U.S.C. § 2635(a). After trial by competent and experienced counsel in the field of customs law, the court, in *Kimball*, held that the plaintiff failed to discharge its burden of proof that the plastic fasteners were not "sew-on fasteners." In essence, faced with seriously conflicting testimony, the court found the testimony of defendant's witnesses to be credible and persuasive, and held that the presumption of correctness of the classification had not been rebutted. See *Ameliotex, Inc. v. United States*, 77 Cust.Ct. 72, 83–84, C.D. 4673, 426 F.Supp. 556 (1976), *aff'd*, 65 C.C.P.A. 22, C.A.D. 1200, 565 F.2d 674 (1977).

In the present litigation, the parties have created a more expansive record, and have submitted voluminous briefs and exhibits. The basic issue, however, remains the same: have the plastic fasteners been improperly classified for customs duty purposes, and has plaintiff rebutted the presumption of correctness which, by statute, attaches to their classification? On this crucial question the court has once again concluded that, over and above the presumption of correctness, it has been persuaded by the testimony of defendant's witnesses that the classification should be sustained. In sum, a most thorough consideration of the testimony of the witnesses, as well as the numerous exhibits, has led the court to conclude that plaintiff has not rebutted the presumption of correctness, nor has it made a "clear and convincing show of error" in the holding of the *Kimball* case. See *United States v. Dodge & Olcott, Inc.*, 47 C.C.P.A. 100, 103, C.A.D. 737 (1960).

*Executive Order 12032*

Rather than eroding the decision in *Kimball*, as plaintiff seeks by a holding that the administrative determinations by Customs in *Kimball* and here were in error, the court must acknowledge the clearly manifested intention of Congress as to the articles embraced under item 745.63, TSUS, as evi-

denced by the President's Executive Order 12032. Under that order, dated December 27, 1977, item 745.63 was superseded by items 745.61 and 745.62, TSUS, as follows:

"Sew-on fasteners and parts thereof:

745.61 Of plastics, in clips suitable for use in a mechanical attaching device . . . . . . . . . . . 27.5% ad val.

745.62 Other . . . . . . . . . . . . 27.5% ad val.
[Emphasis added.]"

The President's Executive Order, issued under the authority of the Trade Act of 1974, Pub.L.No.93–618, coincided with the decision in *Kimball*, which reached the same result in holding the plastic fasteners at issue to be "sew-on fasteners." Although that order cannot be said to have adopted the holding in *Kimball*, since it predated *Kimball* by two months, Congress did not overrule the President's action nor the holding in *Kimball* when it clearly could have done so in subsequent tariff legislation. No change was mandated as to the new item 745.61, TSUS, by the Trade Agreements Act of 1979, nor during the staged duty rate modifications with respect to that item in Presidential Proclamation 4707 of December 11, 1979.* As stated in *United States v. Great Pacific Co.*, 23 C.C.P.A. 319, 324, T.D. 48192 (1936), "A common meaning, having been established once and determined by a court, will be presumed to continue until the language is changed by subsequent legislation." See also *United States v. Schmidt Pritchard & Co.*, 47 C.C.P.A. 152, C.A.D. 750, *cert. denied*, 364 U.S. 919, 81 S.Ct. 283, 5 L.Ed.2d 259 (1960); *United States v. E. Dillingham, Inc.*, 41 C.C.P.A. 221, C.A.D. 555 (1954). Since the holding of the court in *Kimball* was consistent with the Presidential action and subsequent tariff legislation, it cannot be said that *Kimball* was clearly erroneous.

It is pertinent that there is a long history in the field of international commerce for Congress to delegate power to the President to carry out legislative policy. See *J. W.*

*Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928); *Field v. Clark*, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892), and the discussion of those and other relevant cases in *Star-Kist Foods, Inc. v. United States*, 47 C.C.P.A. 52, 56–58, C.A.D. 728, 275 F.2d 472 (1959). In *United States v. Yoshida International, Inc.*, 63 C.C.P.A. 15, 22, C.A.D. 1160, 526 F.2d 560 (1975), the Court of Customs and Patent Appeals observed that "Congress, beginning as early as 1794 and continuing into [the Trade Act of] 1974 has delegated the exercise of much of the power to regulate foreign commerce to the Executive." In considering the correctness of the *Kimball* decision, this court, therefore, must accord appropriate deference to Presidential action which finds authority in specific statutes. In the recent case of *Zenith Radio Corp. v. United States*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978), in which the Supreme Court upheld a determination by the Treasury Department that a remission of a certain Japanese tax was not a bounty or grant within the purview of section 303 of the Tariff Act of 1930, as amended, the court, quoting *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), stated: "When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration."

Although the plaintiff vigorously contests the classification of the plastic fasteners as "sew-on fasteners," it is clear that the administrative action of Customs coincided with the Presidential action which superseded item 745.63 with item 745.61 which classifies as "sew-on fasteners" plastic fasteners "in clips suitable for use in a mechanical attaching device." Indeed, it would be difficult to describe the plastic fasteners at bar with greater precision than their description in item 745.61. Since Executive Order 12032 adopted and ratified the prior practice by Customs, it cannot be said that the court's holding in *Kimball* was unreasonable or clearly erroneous.

---

* The present rate of duty for items 745.61 and    745.62 is 24.8% ad valorem.

Based upon the testimony of defendant's expert witnesses, both in *Kimball* and in the present case, the Presidential action and legislative ratification, it is the court's conclusion that the holding in *Kimball* is not clearly erroneous, but is *stare decisis* of the present action. See *United States v. Rembrandt Electronics, Inc.*, 64 C.C.P.A. 1, 5, C.A.D. 1175, 542 F.2d 1154 (1976). The present item 745.61 resolves all doubt that it is the legislative intent to classify the imported plastic fasteners as "sew-on fasteners." Furthermore, in upholding the classification of the plastic fasteners as "sew-on fasteners" under item 745.63, the imported merchandise is being classified under the tariff provision which most specifically describes it in accordance with General Interpretative Rule 10(c).

*Summary*

In summary, the court has concluded that plaintiff has failed to prove a commercial designation for the plastic fasteners at issue different from the common meaning for "clasps" as determined by prior court holdings.

Plaintiff has also failed to discharge its burden of proving the holding in *Kimball* to be erroneous. Beyond the statutory presumption of correctness, the defendant has presented testimony that the court has found both credible and reliable that the method of affixing the "Tach-It" fasteners is by a process that is a sewing operation.

It is the determination of the court that the plaintiff has not discharged its burden of proving error in the classification of the imported plastic fasteners under item 745.-63 of the tariff schedules. The classification is consequently sustained.

Judgment will be entered accordingly.